## DOMINICK CONNORS *vs.* PATRICK CONNOLLY ET ALS.

Third Judicial District, New Haven, January Term, 1913.
PRENTICE, THAYER, RORABACK, WHEELER and BENNETT, Js.

Workmen may combine to better their condition, but the means adopted
by them to attain that worthy object must be lawful.

An agreement which is contrary to public policy is illegal.

A contract entered into by labor unions and substantially all the manu-
facturers in the chief industry of a locality, to the effect that union
workmen only shall thereafter be employed, is contrary to public
policy. · The tendency of such an agreement is to expose a non-
union workman to the tyranny of the will of others, and to create
a monopoly which will exclude what he has to dispose of, and
other people need, from the open market, or perhaps from any
market.

Whether a contract is opposed to public policy or not does not depend
upon the actual results which may happen to follow its operation
in each particular case, but upon what the contract itself threatens,
what its evil tendencies are, and what possibilities of harm to the
general welfare lie within it.

A workman whose discharge from employment and inability to secure
work is due to the intentional and concerted acts of others, is
prima facie entitled to recover the damage he has thereby sus-
tained. His recovery may, however, be defeated by proof of a
legal justification, the burden of establishing which rests ,upon
those who invoke it.

The plaintiff, a hat "maker" in Danbury, was discharged from em-
ployment and prevented from getting work by the concerted acts
of the defendants, members of a labor union, who attempted to
justify their conduct under an agreement between the representa-
tive of such union and nearly all the hat manufacturers of Danbury
and vicinity not to employ nonunion workmen. *Held* that such
attempted justification must fail, since the agreement upon which
it was based was contrary to public policy and illegal.

The question of public policy, where all the essential facts are undis-
puted, is one of law for the determination of the court; and there-
fore it is error to leave the question to the jury as one of fact.

In instructing the jury as to the legality of the defendants' attempted
justification, the trial court said that the agreement and its result-
ing combination was not unlawful or opposed to public policy
unless either the controlling purpose of its creation was to exclude
nonunion men from the right to earn a livelihood, or the actual
results attending it had been to unreasonably restrain the rights

of nonunion hatters from obtaining employment. *Held* that this statement was inaccurate and harmful to the plaintiff, since it ignored the question of the legality of the means employed.

A labor union has a property right in its label, and may grant or withhold its use as it sees fit; but it cannot employ the label for an unlawful purpose, or as an unlawful means.

Argued January 28th—decided April 17th, 1913.

ACTION to recover damages for an alleged conspiracy to secure the plaintiff's discharge from employment, and to prevent him from working at his trade in the city of Danbury, brought to the Superior Court in Fairfield County and tried to the jury before *Ralph Wheeler, J.;* verdict and judgment for the defendants, and appeal by the plaintiff. *Error and new trial ordered.*

The following facts appeared upon the trial and were undisputed:—

The city of Danbury, in 1909, had a population of about twenty-three thousand. Its industries and those of its vicinity, including Bethel and New Milford, were almost entirely confined to the manufacture of fur-felt hats. In this territory there were about forty shops devoted to their manufacture. In them a very large proportion of the adult population worked and earned their livelihood. All of them, except two, were closed shops, in which union labor alone was employed. The two independent shops were engaged in making soft hats by machine processes. Skilled hand labor was not required, and it was not advantageous to such labor to be employed in them. The other shops all produced hand-made hats, either exclusively or in part.

The manufacture of fur-felt hats is divided into three departments representing three separate trades, to wit, "making," "finishing," and "trimming." Practically the same number of each trade is employed. The trimmers are women; the makers and finishers men. All the makers employed in these closed shops

were, and were required to be, members of the defendant local union. This union, together with other similar locals throughout the country, was a member of a national organization called *The United Hatters of North America.* All the finishers employed in these shops were also members of a local union of finishers which belonged to the same national organization, the United Hatters. The trimmers employed in these shops were likewise all members of a union. This union was not connected with the United Hatters. The defendant local had a membership of about fifteen hundred makers, the Danbury local of finishers about fourteen hundred, and the trimmers' union about the same number. There were also corresponding local unions in Bethel belonging to the same national organization.

In the year 1896, the two then existing national organizations of makers and finishers having amalgamated under the name of the United Hatters of North America, the latter organization adopted, and caused to be registered under the laws of this and other States, a label described in *Lawlor* v. *Merritt,* 79 Conn. 399, 65 Atl. 295, and designed to be used exclusively in hats made by union workmen only. Its use has since that time been granted to manufacturers who employ union labor only, and withheld from all others.

The hat industry in Danbury and vicinity has been more or less unionized for a long period of years. For several years prior to January 15th, 1909, most of the shops in Danbury and vicinity were conducted as union shops employing members of the local unions of makers and finishers solely, and using the union label.

On January 15th, 1909, the great majority of the manufacturers who had formerly operated union shops in Danbury and vicinity, acting in concert with each other and with other manufacturers throughout the

country similarly situated, declared for the open shop, and refused to use the union label. The United Hatters immediately ordered a strike, and all the union men quit work in all the shops of these manufacturers throughout the country. From that date to June 9th, 1909, no work was done in any of the shops whose managers had taken this position. At the latter date the manufacturers in Danbury and vicinity, acting in concert, came to an agreement with the United Hatters by which the strike as to them was settled. This agree- ment bound the manufacturers to resume the use of the union label on September 21st, 1909, and to there- after employ none but union labor. All the shops in Danbury and vicinity, save the two independent ones already referred to, and including that of the Hawes Von Gal Company, joined in this concerted action and were parties to this agreement. As a concession to the manufacturers, for reasons which need not be stated, it was agreed to postpone the date when the agreement should go into effect to that named; but it was agreed that the union employees should return to work at once, and remain at work until the postponed date in their respective shops as open shops not using the label.

The plaintiff was a skilled maker of hand-made hats, and accustomed to work in making stiff hats, and he was especially well adapted, by his training and physical strength, for that class of work. He had for many years been a member of the defendant local union. He was employed by the Von Gal Company at the time the strike was ordered in January, 1909. He obeyed the order and quit work, and remained out of employ- ment until the strikers were ordered back to work in June. He continued to work for the Von Gal Company from that time until September 21st, 1909, when the agreement between the United Hatters and manufac- turers, already recited, went into effect. Pursuant to

the by-laws of the United Hatters, he was entitled to strike benefits of $7 a week, covering the period of the strike, of which amount a considerable sum remained unpaid. After his return to work demands were made of him by the defendant Connolly, secretary and treasurer of the defendant local, and its disburser of benefits, and by the defendant Nees, the plaintiff's fellow-workman and collector of assessments in said shop, for the payment of an assessment levied by the national association, as provided in its constitution. He refused to comply with these demands, upon the ground that a larger sum was due him for strike benefits. Following these refusals he was, without notice or opportunity to be heard, immediately prior to September 21st, 1909, dropped from the rolls of the local union and by that fact from membership in the United Hatters.

September 21st, 1909, he went to his work as usual. The employees in the shop refused to work if he continued to be employed, left their work, and threatened to strike if he remained at his work. The defendant Connolly, who was not employed in the shop, appeared upon the scene shortly after the suspension of work, and he and the defendant Nees were present and participated in some way in what then transpired. The plaintiff thereupon left the shop and did not return again until some days later. When he returned and attempted to go to work, there was a protest from those employed, and the threats to strike if he was permitted to go to work were renewed, and he was not allowed to do so.

The parties were not in accord as to whether he was formally discharged on September 21st, or on the date of his later appearance. But there was no dispute that he was discharged upon the one day or the other, and that he has never since been employed by the Von Gal Company.

The plaintiff claimed to have proved that, following his discharge, he made every effort to find remunerative employment in Danbury and vicinity, but without success; that be began to work in one of the two independent shops, but was so unsuited to that work that he could not earn reasonable compensation thereat; and that he was finally compelled to leave Danbury and seek employment elsewhere, which he did.

The plaintiff offered evidence tending to show direct participation by the defendants Connolly and Nees in the events which led up to his discharge, their leadership in the demands and threats made, and their representation of the defendant union and union employees in what was done on and subsequent to September 21st. The defendants offered evidence to disprove such participation, leadership, and representation.

The defendants offered a large amount of testimony concerning the history of union labor in Danbury, the development of the hat industry in that community, the effect of unionism upon that industry and upon the conditions and wages of those employed in it, the social conditions of the city and its prosperity and progress,— all designed to establish that the results of the union conditions there, past and present, had been beneficial and not harmful.

The parties offered evidence to prove a variety of other facts, which, except as they are stated in the opinion, need not be recited, as they do not concern its discussions or conclusion.

*Walter Gordon Merritt* of New York, with whom was *Charles Welles Gross*, for the appellant (plaintiff).

*Howard W. Taylor*, for the appellees (defendants).

PRENTICE, C. J. The defendants are charged with having been, through their action in wrongful combi-

nation, the cause of the plaintiff's discharge from his employment for hire at his trade as a hat "maker." The undisputed facts show that he was discharged, and that the discharge was the direct consequence of his having been dropped from the roll of membership of the defendant local union and from the national body to which it belonged, and of the existence of an agreement between that national body, representing the defendant union and its affiliated unions, and his employer, requiring his discharge if a nonunion man, and of the insistence of his fellow employees, members of the union and an affiliated union, that the agreement be kept, and their threat to strike if it was not kept.

The pleadings and evidence presented for decision several prominent issues, to wit: (1) as to the several defendants' participation in and responsibility for the acts and things complained of; (2) as to the lawfulness of these acts and things; and (3) as to the legality of the plaintiff's dismissal from the union. We are asked to review the instructions of the court respecting the last two aspects of the case, which would have assumed large importance if the jury should have found, as it might upon the evidence as indicated by the facts claimed to have been proved, that the defendants participated in a combination to do the acts and things charged.

The undisputed facts disclose that the plaintiff suffered damage in the loss of his employment, and that this damage was intentionally caused. These facts shown, a prima facie cause of action was made out against those who, thus acting with intent, caused the damage. Recovery, however, might be defeated by the establishment by these persons of a justification, the burden being upon them to do so. *Aikens* v. *Wisconsin*, 195 U. S. 194, 204, 25 Sup. Ct. Rep. 3; *Martell*

v. *White,* 185 Mass. 255, 258, 69 N. E. 1085; *Berry* v. *Donovan,* 188 Mass. 353, 356, 74 N. E. 603; *Lucke* v. *Clothing C. & T. Assembly,* 77 Md. 396, 405, 26 Atl. 505; *Mogul Steamship Co.* v. *McGregor,* L. R. 23 Q. B. D. 598, 613.

The defendants presented and strenuously urged in justification for what was done resulting in the plaintiff's loss of employment, that it was all directed solely to the betterment of their condition as workingmen engaged in securing a livelihood for themselves and those dependent upon them through the medium of their trade. Such a purpose is, of course, a worthy, and therefore not an unlawful, one.

There remains for consideration the character of the means employed. Were they such as the law will approve, or such as it must condemn?

These means resulted, as we have seen, in causing the plaintiff to suffer loss of employment. They were not, however, for that cause alone unlawful; and the fact that they were adopted and put into operation by a number of persons acting in combination did not suffice to make them so. The members of the defendant union were acting within their rights when they combined for concerted action. They were entitled to advance their interests in that way, and their efforts in combination were not illegal for the mere reason that they may have resulted in harm to the conflicting interests of others. The perpetual struggles of life for individual or class betterment and advancement involve at every turn clashes of interests whose outcome is quite likely to bring loss or harm to some one. Competition is one of the ever-present facts in human experience on its material side. But competition naturally involves the success of one or some to the disadvantage of another or others. The law recognizes that human activities are not to be so circumscribed

that one may not, in his efforts to advance his own interests, either himself or in co-operation with others, do anything from which another may suffer. *National Protective Asso.* v. *Cumming,* 170 N. Y. 315, 335, 63 N. E. 369. But it does recognize that certain bounds must be set to the use of means, beyond which he and his associates may not be permitted to go, if a decent regard for the rights of others is to be preserved and the public welfare conserved. It recognizes the peculiar necessity for the establishment of such bounds, where the action is that of individuals in combination, by reason of the great power which may result from such combination, and the temptation to use that power in disregard of the rights of persons outside of it. *Mogul Steamship Co.* v. *McGregor,* L. R. 23 Q. B. D. 598, 616; *Martell* v. *White,* 185 Mass. 255, 260, 69 N. E. 1085.

One of the bounds thus fixed, where, as here, concerted action by combinations is concerned, is that the harm inflicted be reasonably referable to the alleged object of lawful gain or advantage; that the means employed be adopted in good faith for the attainment of that object; and that their employment be not prompted by personal ill-will, desire to injure, or express malice of any sort. In the present case the defendants claim to have established a strict compliance with this condition, and that may be assumed.

The law, in the interest of fair play and general public welfare, does not stop here. It demands that the means employed, in the effort to secure the laudable or lawful end, be of themselves not unlawful. They may be unlawful as being in contravention of statutory prohibition, or in the absence of such prohibition.

The defendants contend that the test to be applied for the determination of lawfulness or unlawfulness of means, where there is no statutory enactment, is their

reasonableness or unreasonableness. The trial court seems to have held the same view. For the purposes of this case, we have no occasion to give authoritative approval to this or any other test as one of general and comprehensive application. It is manifest that those means must be regarded as both unreasonable and unlawful which are contrary to public policy, and this proposition is sufficient for our guidance in the situation before us. We may well, therefore, pursue our inquiry along the narrow lines, most favorable to the defendants, of public policy. By this course we may be saved the necessity of discussing the mooted question whether "unreasonable," in this connection, comprehends anything more than what is opposed to public policy. It certainly comprehends that, and we shall do no harm to the defendants' interests by bringing their conduct to this test.

The court submitted this question of public policy to the jury. Defendants' counsel assert that it was one of fact for the jury's determination, and this is the fundamental proposition upon which he rests his case. This is a mistaken notion. All the essential facts bearing upon that question being undisputed, it was one of law for the court. *Oscanyan* v. *Arms Co.*, 103 U. S. 261, 268; *DeMinico* v. *Craig*, 207 Mass. 593, 598, 94 N. E. 317; *Cummings* v. *Union Blue Stone Co.*, 15 N. Y. App. Div. 602, 605, 44 N. Y. Supp. 787, 789, 164 N. Y. 401, 404, 406, 58 N. E. 525; *Raymond* v. *Leavitt*, 46 Mich. 447, 450, 9 N. W. 525; *Weber* v. *Shay & Cogan*, 56 Ohio St. 116, 124, 46 N. E. 377; *Tallis* v. *Tallis*, 1 El. & Bl. 390, 399, 411.

Certain cases appear to give countenance to the broad proposition that every agreement, whatever the conditions, by a labor union with an employer, which provides that the latter shall not employ, either at all or in any given department of his work, any other per-

sons than union members, is contrary to public policy. *Curran* v. *Galen,* 152 N. Y. 33, 46 N. E. 297; *Berry* v. *Donovan,* 188 Mass. 353, 74 N. E. 603. We have no occasion to assert this broad proposition, and may well confine ourselves to one which all the authorities coming under our observation are in full accord in supporting, to wit: that where the agreement is one which takes in an entire industry of any considerable proportions in a community, so that it operates generally in that community to prevent or to seriously deter craftsmen from working at their craft, or workingmen obtaining employment under favorable conditions without joining a union, it is contrary to public policy. *Jacobs* v. *Cohen,* 183 N. Y. 207, 211, 76 N. E. 5; *Berry* v. *Donovan,* 188 Mass. 353, 74 N. E. 603; *Barnes & Co.* v. *Berry,* 156 Fed. Rep. 72, 77; *Delaware, L. & W. R. Co.* v. *Switchmen's Union,* 158 Fed. Rep. 541, 545.

The reasons for this conclusion are as evident as they are convincing. "There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor." *Slaughter-House Cases,* 83 U. S. (16 Wall.) 36, 106. "The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellow-men, saving such as may result from the exercise of equal or superior rights on their part." *Brennan* v. *United Hatters,* 73 N. J. L. 729, 742, 65 Atl. 165.

It needs no argument to demonstrate that any combination between employers and employed, which creates a condition in a community such as has been hereinbefore described, is a serious menace to the craftsman or workingman who, in the exercise of his free right of choice, does not wish to join a union. It

·is calculated to place upon his freedom of choice and action a coercion which leaves him no longer wholly free. Its tendency is to expose him to the tyranny of the will of others, and to bring about a monopoly which will exclude what he has to dispose of, and other people, need, from the open market, or perhaps from any market. *Berry* v. *Donovan,* 188 Mass. 353, 359, 74 N. E. 603; *Curran* v. *Galen,* 152 N. Y. 33, 37, 46 N. E. 297.

Monopolies of things of common use and need, whether created by governmental grant or by the acts of private persons or corporations, are odious, and their existence is contrary to public policy. They were condemned by the common law of England, and, although changing in their more common source, have remained under a like condemnation in that country and this to this day. They are especially intolerable where they concern the basic resource of individual existence, to wit, the capacity to labor. *Case of Monopolies,* 11 Coke, 85; *Slaughter-House Cases,* 83 U. S. (16 Wall.) 36, 104; *Berry* v. *Donovan,* 188 Mass. 353, 359, 74 N. E. 603; *People* v. *Sheldon,* 139 N. Y. 251, 265, 34 N. E. 785. The whole theory of a free government is opposed to them. *Norwich Gas Light Co.* v. *Norwich City Gas Co.,* 25 Conn. 19, 38. Their beneficiaries may enjoy the favors they bestow, and feel injured when deprived of them. But the interest of the public outweighs that of individuals, and the public at large can see nothing but danger in the monopoly of anything of which there is a common need, or which is a common resource of life. This is an old and familiar doctrine in whose maintenance none have as deep a concern as the poor, the humble, and those who live by the labor of their hands. The monopoly need not be complete to come under the ban of the law. "It is sufficient if it [the agreement] really tends to that end

and to deprive the public of the advantages which flow from free competition." *United States* v. *Knight Co.*, 156 U. S. 1, 16, 15 Sup. Ct. Rep. 249.

Let us turn now to the situation before the court as shown by conceded facts. Danbury, a city with a population of twenty-three thousand, was, at the time of the plaintiff's loss of employment, a great fur-felt hat manufacturing center. The industries of the city and vicinity were almost entirely confined to that one. There were approximately forty shops devoted to it. In these shops a very large proportion of the adult population, and about one fourth of the males of all ages, were employed. Nearly all of these employees were members of unions, and all of the shops, save two, were operated under an agreement with the national organization of the unions that no other than union labor be employed in them. These two shops produced machine-made soft hats only—a distinct branch of the business and a different one, as the plaintiff claimed to have shown, from that to which he was accustomed, and in which he could work to the best advantage. The employment in any one of the closed shops of a person not a member of the union involved the withdrawal of the right to use the union label and a refusal to work by all other persons employed.

It would be difficult, we imagine, to find a more marked instance of a large community given over to a single industry and dependent upon employment in that industry. If ever there was a situation where the individual, if for any reason satisfactory to himself, however mistaken it might be, he chose not to join a union, was placed in a more disadvantageous position, or brought under a greater pressure to surrender his freedom of choice, it certainly has not been one of ordinary occurrence. It is idle to contend, and defendants'

counsel does not venture to contend, that, under such conditions, a workingman lives and acts in an atmosphere of freedom, that he is under no compulsion or coercion from others in the pursuit of his lawful vocation, and that there is preserved to him the boasted freedom of a free people in that most important of all departments of life wherein he gains the means to support or elevate in the social scale himself and family.

It is equally apparent that not only the seeds, but the fruit, of monopoly were present in striking measure. The field of labor was substantially monopolized. The door of opportunity to work at his trade was not open to any hatter in this great hive of industry, save only a very few, except by the route of the union. To the plaintiff and other skilled hand workmen it was absolutely shut, unless they consented to take up a line of work not the most advantageous to themselves, and to which they were not accustomed.

In the presence of such facts, disclosed by undisputed evidence, it was the plain duty of the court to have complied with the plaintiff's request to instruct the jury that the defendants' sole attempted justification, based as it was upon the restrictive agreement between the employers of Danbury and vicinity and the United Hatters, and action to secure the enforcement of its provision for the nonemployment of non-union men, was not a justification in law, since it was one involving the use of means forbidden by public policy. This it not only did not do, but it left it to the jury to determine as a question of fact whether or not the agreement and its enforcement was contrary to public policy.

But that is not all. Having left the controlling question in the case to the jury, its instructions for their guidance in determining it were not correct. In that portion of the charge where the agreement and

its resulting combination were discussed in their bearing upon the lawfulness of the attempted justification, the jury were told, in substance, that the condition created by them was not unlawful or opposed to public policy, unless either the controlling purpose of its creation was that of excluding nonunion men from "the right to earn a livelihood," or the actual results attending it had been "to unreasonably restrain the rights of hatters who were not members of said organization, from obtaining reasonable employment, and from earning a livelihood." This statement was most inaccurate and harmful. It is familiar law that a combination may be unlawful, either for the reason that its object is unlawful, or for the reason that the means resorted to to accomplish its object are unlawful. Presumably the court was here recognizing that principle and undertaking to deal with the two alternatives—the object and the means—as the two possible sources of unlawfulness.

Passing by what was said in respect to the object or purpose of the agreement and combination, we find the court falling into the error of losing sight of the means employed in the actual results which followed, or, more correctly speaking perhaps, judging the character of the means by the results actually produced by them. The jury were told that before they could find the operation and enforcement of the agreement contrary to public policy they must take into consideration "all the circumstances of trade in Danbury and vicinity, its history, and the resulting condition as it existed, the number of hatters employed, and the number out of employment and kept so, the wages paid, and many other facts suggested in the answer."

This proposition proceeds upon the fundamentally mistaken theory that a contract or combination is to be judged, as to its conformance with public policy,

by the results which may have come from it. The law does not look to the results which may be attributable to its actual operation, to discover whether or not a contract or combination is contrary to public policy. It examines the contract or combination itself to learn what it threatens, what its evil tendencies are, and what possibilities of harm to the general welfare lie within it. *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401, 404, 58 N. E. 525; *Harding* v. *American Glucose Co.*, 182 Ill. 551, 619, 55 N. E. 577; *Brown* v. *First National Bank*, 137 Ind. 655, 669, 37 N. E. 158; *Firemen's Charitable Asso.* v. *Berghaus*, 13 La. Ann. 209, 210; *San Antonio Gas Co.* v. *State*, 22 Tex. Civ. App. 118, 125, 54 S. W. 289. "The question of the validity of the contract does not depend upon the circumstance whether it can be shown that the public has, in fact, suffered any detriment, but whether the contract is, in its nature, such as might have been injurious to the public. It matters not that any particular contract is free from any taint of actual fraud, oppression or corruption. The law looks to the general tendency of such contracts." Greenhood on Public Policy, p. 5.

The defendants claim support for their plea of justification through the part which the union label played in the situation. We fail to discover in the brief of counsel any clear statement of the reasons for this claim. The nearest approach to an announcement of his position is to be found in one of his concluding paragraphs, as follows: "We believe that the United Hatters of North America, as the owners and controllers of the union label, could absorb all of the labor market in any community, so that persons who were not members of the organization, would be unable to obtain work at hatting, in that community, as long as the label stands for what it does, in the shape of

skilled labor, improved sanitary conditions, and long term contracts.  These advantages to society at large would outweigh  any disadvantages which might accrue to a few people desiring to obtain work, because the rule of law in relation to a closed shop as enunciated in the Curran Case, is based upon the theory that the excluded workman is equally as good as the member of the organization, and that all have an equal right to employment.  But it is respectfully submitted that this rule of the common law, like every other rule of the common law is based upon reason, and when the reason for the existence of the rule ceases, the rule, itself, ceases."

This is a unique and astonishing proposition, both for what it says and what it implies, to be addressed to a court in this country, with its common-law inheritance as to the importance of safe-guarding individual rights, and its dedication to freedom of action within the law and equal rights for every member of society.  It reads strangely beside the emphatic language of our courts, repeatedly uttered.  Under the application of its controlling rule, monopolies might become transformed into blessings to be cherished, oppression into an agency of the public weal, and the tyranny of a majority into a benevolent factor in social progress.  The end would justify, and even sanctify, the means.  We must decline to place our seal of approval upon any such revolutionary doctrine.

The United Hatters have a property right in its label.  It may withhold it from those who do not comply with the conditions it attaches to its use.  It may grant its use to those who do so comply.  It may enjoy its advantages in all lawful ways.  But it can no more employ it for an unlawful purpose, or as an unlawful means, than it or any other person can any other thing which it or they own, or any other agency at its or

Vol. LXXXVI—42

their command. The use of all property or privileges is confined to the lawful, and cannot be extended to the unlawful.

The plaintiff, upon the trial, claimed that all possible justification for the acts, which brought about his discharge, was removed by the circumstances attending his suspension by the union. He asserts that he was unlawfully suspended, and that therefore his true status at the time was that of a member. His contention was that the suspension was unlawful, for the reason (1) that it was without notice to him or opportunity to be heard, and (2) that the union was at the time owing him, as strike benefits, a much larger sum than the assessment demanded of him. The facts were substantially undisputed. The court instructed the jury flatly against the plaintiff's contention upon both phases of it. These instructions are assigned as erroneous. In view of our conclusion reached upon the larger question already discussed, we have no occasion to consider these assignments.

There is error and a new trial is ordered.

In this opinion the other judges concurred.