POLK ET AL. v. THE CLEVELAND RY. CO.

*Contracts—Action not maintainable if agreement illegal, although acted upon—Contract to employ only union labor contrary to public policy, when—Employment of only union labor by street railway—Arbitration provisions unenforcible where contract entire and not severable—Party to common-law arbitration may withdraw before award made —Fraud in selecting arbitrators vitiates award—Arbitration of terms of new contract not an appraisal—Award of arbitrators, under illegal contract, unenforcible.*

1. No action is maintainable directly or indirectly on contract illegal as against public policy, though parties have acted under agreement, or have been lax in invoking claim of illegality.

2. Contract by employer to employ only union labor is contrary to public policy, when it includes an entire industry so as to operate generally in the community, preventing workmen from obtaining employment under favorable conditions without joining the union.

3. Contract between street railway company, operating all city street car lines, and employees' union to employ only union labor, and requiring employees not members of the union to join union within 60 days or be discharged, *held* illegal as against public policy.

4. Contract between street railway company and union of employees, providing terms and conditions of work *held* entire, not severable, and hence arbitration clause in contract could not be enforced where remainder of contract was illegal.

5. Either party in common-law arbitration may withdraw therefrom at any time before award has been actually made.

6. Evidence *held* to show that there was legal fraud in selection of key arbitrator in arbitration proceedings between union and street railway, and hence award could not be binding on railway.

[1] Contracts, 13 C. J. §§ 440, 451; [2] Id., § 439; [3] Id.; [4] Id., § 525; [5] Arbitration and Award, 5 C. J. § 92; [6] Id., § 685.

7. Arbitration to determine terms of new contract between employees and street railway company for coming year *held* not an appraisal, which involves settlement of dispute as to present quantity or quality of subject-matter.

8. Award of arbitrators, made under contract illegal as against public policy, cannot be enforced.

(Decided April 4, 1925.)

APPEAL: Court of Appeals for Cuyahoga county.

*Messrs. Day & Day*, for plaintiffs.
*Messrs. Squire, Sanders & Dempsey*, for defendant.

BY THE COURT. The Cleveland Railway Company has been for the past 15 years or more the operator of all of the city street car lines in the city of Cleveland. In 1906 the company entered into the contract that is pleaded by the plaintiffs, a copy of which is attached to the petition, with the Local Union No. 268 of the Amalgamated Association of Street and Electric Railway Employees of America, hereinafter referred to as the union, which union was affiliated with the American Federation of Labor. For these past 15 years, the company and the union have been operating under and in conformance with this contract, some changes from time to time having been made, and the terms of the same having been extended, until now they are in force and effect until May 1, 1925.

In May of 1924 the union served the notices called for in this contract, upon the company, requesting or demanding certain changes and modifications in the contract, among others, an increase

[7] Arbitration and Award, 5 C. J. § 4; [8] Id., § 39.

in pay and some allowances of time for making out accident reports. The demands of the union were not acceded to by the company, which resulted eventually in the selection of arbitrators under the terms of the contract to settle the dispute, and the board of arbitrators met in May, heard the evidence, and on June 3d made a finding and award, concurred in by the two arbitrators selected by the union and the fifth or key arbitrator, Holcomb, the two members selected by the company having withdrawn from the arbitration proceedings. In this award there was an increase in pay, and the company thereby was required to pay an increase to the motormen and conductors amounting to 12 cents an hour, which increased pay was to begin the 1st day of May, 1924; and there was also time given for reports of accidents.

The company refused to comply with this award, upon several grounds, the first being that the contract itself, under which the award was attempted and under which the parties to this suit have been operating for the past 15 years, is illegal and void as against public policy; second, that regardless of the question of the legality of the contract, the provisions therein covering arbitration called for a common-law arbitration at best, and therefore the award had is not binding upon the company, because it withdrew from the proceedings before there had been an actual award or determination by the board; third, that there was fraud in behalf of the union in the selection of the fifth arbitrator, it being claimed that he was prejudiced against the company, and, not only in sympathy with the union, but morally obligated to it by rea-

son of indorsements given him for political advancement.

Upon the refusal of the company to comply with the award and upon its threat to disregard the contract and to employ nonunion men, the plaintiffs, in behalf of the union, brought this action in equity to compel the company to carry out the award of the arbitrators and to pay to the members of the union the wages fixed by the award, and also to restrain the company from violating the contract between the parties in the respects set forth in the petition.

The action having been disposed of in the court below, not to the satisfaction of either party, appeal is perfected here by both parties, and is submitted to us upon a transcript of the evidence taken in the court below, and upon the conceded facts.

The first question confronting us is as to the legality of the contract involved herein. If it is a contract void against public policy, no court should allow itself to be made the instrument to enforce its obligations or to consummate an end that the policy of our law forbids.

Contracts that are illegal and against public policy have always been discouraged by the courts, and no action based upon such a contract is maintainable either in law or in equity, either directly or indirectly, to uphold the contract. The authorities quite uniformly agree that the court should look upon such a contract as no contract at all, and that an effort to enforce it, either directly or indirectly, or to claim benefits thereunder in a court of law or equity, is an effort to procure the

assistance of the court to carry out something that is against the interest of the public. And this the court will not do, even though the parties have acted under such an agreement and reaped the benefits thereof, or have been lax and tardy in invoking the claim of illegality.

The company, one of the parties to the contract here involved, was the only operator of city street railway lines in the entire city of Cleveland, and the contract contained agreements to the effect that the company would employ only union labor. It required all employees that were not members of the union to join the union within 60 days, or otherwise be discharged.

Contracts by which an employer agrees to employ only union labor are contrary to public policy when they take in an entire industry of any considerable proportions in a community so that they operate generally in that community to prevent or seriously deter craftsmen from working at their craft or workmen from obtaining employment under favorable conditions without joining a union. And such was the contract here, and it must necessarily be held to be in conflict with the public policy of our law, and illegal and void. The universal trend of authorities supports this position. In addition to the cases cited by counsel, there is to be found in 13 Corpus Juris, p. 492, Section 439, a collection of the cases and a discussion of the rule.

It is contended, however, on behalf of the plaintiffs, that, notwithstanding the contract may be illegal in that part providing for a closed shop, still it should be considered as severable in its terms, and that so considered the provision for arbitra-

tion would be valid and enforceable; or, that, if the entire contract be held void, still the defendant has submitted to what was in effect a common-law award by arbitrators voluntarily selected, and is therefore bound by the award made by the arbitrators, and that therefore the remedy plaintiffs seek in this case is still available.

If the contract is to be adjudged a severable contract rather than an entire one, it is because, by a judicial interpretation thereof, it appears that it was contemplated and intended by the parties that the nature and purposes of its subject-matter, and its various terms, were to be divisible and independent of each other, and that the parties intended that each provision therein stand as a contract between them, independent of the other terms or agreements.

Elliott, in his work on contracts, Section 1543, and following, in a discussion of this subject, says in effect that, when the terms, nature and purposes of a contract show that it is contemplated and intended by the parties that each and all of its parts, material provisions and the consideration, are common each to the other and interdependent, it is to be considered an entire contract. To be considered a divisible contract, it must appear that it is one from its nature and purposes susceptible of division and apportionment, and has two or more parts in respect to the matters and things embraced by it and not necessarily dependent upon each other, and that the parties did not intend that they shall be so dependent upon each other. And then in following sections will be found illustrations of severable and entire contracts.

The contract here involved had for its purpose, principally and almost entirely, the provision for the terms and conditions under which the members of the union would work for the company, including some provisions for better conveniences and better hours, and then a provision that the terms of the contract as it was drafted could be changed to cover future years. Then came the provision for arbitration in case the union and the company failed to agree. We are not able to see how one could say that the provision for arbitration was a clause that the parties to this contract contemplated and intended should be taken as a lone and independent matter of agreement between the parties, to be enforced regardless of whether other provisions in the contract could stand or not. It seems, rather, that the provision for arbitration was only incidental to the real purpose of the contract, and that questions that arose touching and regarding the services to be rendered by the union men were the subjects to be arbitrated in case of disputes.

It might readily be seen how easily this invalid contract might be indirectly enforced by holding that the provision for arbitration could stand alone and be considered as a valid and binding contract between the parties, when we consider how easy it would be for the union to say to the company that there were men in its employment who for stated plausible reasons, but because of the real and secret reason that they were nonunion men, should be discharged. And in case the company refused to discharge them, compulsory arbitration would follow which might indirectly enforce upon

the company a closed shop agreement. Many other illustrations, in effect the same as this, might be brought to mind. We are convinced that this is an entire contract and not severable. If we view the proceeding had before the arbitration board as a common-law arbitration voluntarily entered into by the parties, as urged by plaintiffs, in what position do the parties find themselves?

It is well recognized by the authorities in regard to a common-law arbitration that either party may withdraw therefrom at any time before the award has been actually made. In the case before us, the defendant did withdraw from the proceedings before an actual award had been made, and in our judgment that disposes of this question.

Plaintiffs contend, however, that, if this be held to have been a common-law arbitration, still the withdrawal was not made until after information was procured by the defendant in advance that on the day following the award would be made, as it was, and that under such circumstances a withdrawal is not permissible under the rule above referred to; and, further, that the arbitration had was but an appraisal in fact, and that the right to withdraw did not exist at all.

In answer to this, the defendant, insisting that it is not, under any circumstances, an appraisal, asserts that there was fraud in the selection of the arbitrators and that hence, for this reason, there was not a fair and just arbitration, and that whatever might have been done by the board of arbitrators would not be binding upon the defendant.

The evidence shows clearly that while there may

have been no intention or design upon the part of the union or its friends, or upon the part of James W. Holcomb, the fifth or key arbitrator, selected by the other four, yet the circumstances and facts shown in regard to his relation to the union and his attitude towards both parties, and the other facts and circumstances, warrant this court in finding in effect, which we do find in this case, that there was legal fraud in the selection of Mr. Holcomb and in his continuing to sit as an arbitrator, and hence for that reason the award cannot be held to be binding upon the defendant.

We cannot see under what principle or theory the matters and things submitted to arbitration here involved could be viewed as but an appraisal. It was not to determine the value of services already rendered, but to determine what the terms of a new contract for a coming year were to be. It involved the future, while an appraisement usually involves the settlement of a dispute as to the present quantity or quality of something, whether it be wages already earned, the value of something lost or destroyed, or the like.

But aside from this consideration, it is clear that this submission to arbitration was under and by virtue of the contract, and by reason of that contract only, and had it not been for the contract there would not have been this submission, and hence to enforce any award made by virtue of this arbitration would be at least indirectly upholding and enforcing the contract that we hold to be illegal and void as against public policy.

For the reasons given herein, the decree will be

for defendant. Motion of plaintiffs for new trial will be overruled.

*Decree for defendant.*

HUGHES and WARDEN, JJ., concur.

Judges HUGHES and WARDEN, of the Third Appellate District, and Judge ROBERTS, of the Seventh Appellate District, sitting in place of Judges LEVINE, SULLIVAN and VICKERY, of the Eighth Appellate District.

ROBERTS, J., dissenting. The union seeks by specific performance, or mandatory injunction, the enforcement of an award made in an arbitration entered into by the parties hereto. The company denies the validity of the award, and seeks to avoid compliance therewith for several reasons, which are interposed as defenses to the claims of the union, which will be hereinafter mentioned and considered to the extent thought pertinent and necessary for present purposes.

The parties entered into a written contract in 1906, to be in effect until May 1, 1924, and by its terms it was extended to May 1, 1925. The object of the contract was for the control of their mutual relations as employer and employees. The company owns and operates a system of street railway in the city of Cleveland and contiguous municipalities in Cuyahoga county, Ohio, which includes all the street railroad within this territory, serving a resident population of about 1,000,000 people. It operates over about 400 miles of track, and is exclusive in its business within the territory

served by it. The union is composed of the company's motormen and conductors, about 3,000 in number. This contract has been in continuous effect, with certain changes agreed upon from time to time, since first made in 1906.

It is urged by the company that the contract is void for the reason that it provides for a closed shop, with a public utility having a monopoly of the street railway business in the territory above mentioned, and being the sole employer of all classes of labor incident to the operation of street railroads.

Section 1 of the contract provides, in part, as follows:

"All motormen and conductors who are now or who may hereafter become members of the association shall remain members of the association in good standing so long as they remain in the service of the company, provided that such continuous membership shall not conflict with the laws of the association. All motormen and conductors employed in the future, after a probationary period of 60 days, if they still remain in the service, shall make application to become members of the association. Whenever the association expels a member for violation of its laws, the company agrees to dismiss said member from its service upon satisfactory proof of such violation."

There is no contention of the fact that the company offers the only opportunity for employment in its lines of activity within the territory over which it operates. All motormen and conductors employed by the company, except for a brief probationary period of 60 days, must be members of

the union, and there is no other market for such labor.

It is not claimed that collective bargaining, as a general principle, is unlawful, but it is asserted that when the employer controls all opportunity for labor, and the union affords the only labor available, as the result of a contract, particularly where the employer is a public utility, operating to serve the public exclusively, in a community of considerable extent, such as above mentioned, such agreement and condition are what is denominated a "closed shop," and unlawful.

The rule is stated in 13 Corpus Juris, 492, Section 439, as follows:

"*Employment of Union Labor.*—A contract by which an employer agrees to employ only union labor is contrary to public policy, where the agreement is one which takes in an entire industry of any considerable proportions in a community, so that it operates generally in that community to prevent or seriously deter craftsmen from working at their craft or workingmen from obtaining employment under favorable conditions, without joining a union."

The reasons for this rule have been stated in *Slaughter House Cases,* 16 Wall., 36, 106 (21 L. Ed., 394):

"There is no more sacred right of citizenship than the right to pursue unmolested a lawful employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

"The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business

or occupation as he himself may choose, free from hindrance or obstruction by his fellow men, saving such as may result from the exercise of equal or superior rights on their part." *Brennan* v. *United Hatters of North America, Local No. 17*, 73 N. J. Law, 729, 65 A., 165, 9 L. R. A. (N. S.), 254, 118 Am. St. Rep., 727, 9 Ann. Cas., 698.

Other authorities may be cited as follows:

"The right to dispose of one's labor as he will, and to have the benefit of one's lawful contracts, is incident to the freedom of the individual, which lies at the foundation of the government in all countries that maintain the principles of civil liberty. Such a right can lawfully be interfered with only by one who is acting in the exercise of an equal or superior right which comes in conflict with the other. An intentional interference with such a right without lawful justification is malicious in law, even if it is from good motives and without express malice." *Berry* v. *Donovan*, 188 Mass., 353, 74 N. E., 603, 5 L. R. A. (N. S.), 899, 108 Am. St. Rep., 499, 3 Ann. Cas., 738.

"*Contracts for Union Labor Exclusively.*—A contract which requires an employer to hire union labor exclusively is said to be invalid, at least if such contract includes practically the entire industry in a given community and such industry is of such proportions that such contract will prevent other workmen from obtaining employment under favorable conditions unless they join the union, or if the purpose of entering into such contract is primarily to injure workmen who are not members of the union. The fact that the actual operation of such contract has been beneficial rather than in-

jurious does not render it valid." 2 Page on Contracts, Section 821.

"There is a damage to the plaintiff, whether he is the employer whose employees have been induced to leave, or an unknown employee whose discharge has been brought about without a sufficient correlative gain to the defendants. The weight of authority is quite plainly against the closed shop." 5 Pomeroy's Equity Jurisprudence, Section 2038.

"An agreement between a labor union and employers, which provides that the latter shall not employ nonunion laborers, is contrary to public policy, where the agreement embraces an entire industry of any considerable proportions in the community, so that it will operate generally in that community to prevent or to seriously deter craftsmen from working at their trade under favorable conditions without joining a union." *Connors* v. *Connolly*, 86 Conn., 641, 86 A., 600, 45 L. R. A. (N. S.), 564.

Many other authorities to like effect might be cited, but those above set forth are sufficient to indicate the general and well-established rule applicable to such conditions. Cases may be found where the right to contract with a union for the employment of its members only is recognized, as is also the right to discharge because not members of a union, but this line of authorities contemplates a situation where the employer, or combination of employers, does not control or monopolize the market for labor of any particular kind.

Many cases are cited under the text above quoted from Corpus Juris, which have been examined, together with those cited in brief in this case, as well as numerous other authorities, with the result that

the conclusion is irresistibly reached that where a contract, by observance of its terms, prevents a class of workmen from obtaining or retaining employment unless they belong to a union, it is contrary to public policy and void.

The authorities cited by counsel for the union are largely upon the general proposition of collective bargaining and the right of the employer to agree to employ only union labor and to discharge non-union labor (rights which are not denied), but do not involve a condition of monopoly of all such labor.

Applying the rule above recognized to the instant case, the conclusion is further reached that the contract, in so far as it provides for a closed shop, is void. Thus far I am in accord with the majority opinion.

It is further the contention of the company that by reason of the invalidity of the closed shop provision the whole contract is void, including the provision for arbitration and the arbitration award. It is provided in the contract (Section 2):

"Should any dispute arise between them which cannot be mutually adjusted, the same shall be submitted at the request of either party, to a board of arbitration, as provided for in this agreement, and during the arbitration the conductors and motormen shall continue the operation of the company's cars."

Section 3: "For the purpose of settling disputes which cannot be mutually adjusted between the company and the association, there shall be selected a board of arbitration composed of three disinterested persons, one to be chosen by the com-

pany, one by the association, and the two thus selected to select the third arbitrator, the finding of the majority of said board of arbitration to be final and binding upon all the parties hereto.''

Section 14: ''Either of the parties hereto, desiring a change in any section or sections of this agreement shall notify the other party in writing of the desired change 15 days prior to the end of each year, which is the 1st of May. After such notice the agreement shall be opened up and the change or changes considered. Upon failure to reach a mutual agreement upon any change desired by the parties hereto, the same shall be arbitrated as provided in this agreement, and this agreement shall then be modified to conform to the decision of the arbitrators.''

The issue is now presented whether the whole contract is void by reason of the illegality of the closed shop provision, as claimed by the company, or whether the provision for an arbitration still exists as an agreement between the parties. Pursuant to these provisions of the contract, the union, within proper time, submitted to the company a formal request in writing, plaintiffs' Exhibit 3, for certain changes in the contract, 27 in number, for the ensuing year commencing May 1, 1924. One was for an increase in wages and another was for an allowance of time for making out accident reports, which two proposed changes were the only ones recognized by the award subsequently made. The provision of this agreement as to the closed shop and that relating to arbitration were separate and distinct. Neither was essential to the contract nor to each other. As a whole the contract pro-

vided for employment. The provision concerning the closed shop went too far and was void. In any event, the work of this public utility must go on, and men must be hired and remuneration agreed upon and paid. Section 2 provides, not for anything agreed upon, but for matters of dispute arising in the future, and for the procedure by which they may be adjusted. The contract recognized the inability of the parties to foresee and provide for unknowable future conditions, what would be proper wages, and other matters, and therefore provided for future changes by arbitration when they could not agree. These were not parts of an inseparable consideration upon either side. Conditions of the service required were constantly changing, such as the cost of living and other matters proper to consider in determining a reasonable wage. Such provisions were necessary, with or without a closed shop, with or without nonunion labor. In any event, the retention of skilled and experienced men was important, and such provisions were the only feasible ones known by employer or employe. The consideration of these provisions for arbitration was the reciprocal fairness of each side to the other, thus, and not otherwise, obtainable. If the union was not recognized the necessity for arbitration would not be lessened. There was no single consideration, illegal in whole or in part, on either side, moving to secure all that was promised on the other side.

"Where an agreement founded on a legal consideration contains several promises, or a promise to do several things, and a part only of the things to be done are illegal, the promises which can be

separated, or the promise, so far as it can be sep-
arated from the illegality, may be valid. The rule
is that a lawful promise made for a lawful consid-
eration is not invalid merely because an unlawful
promise was made at the same time and for the
same consideration." 13 Corpus Juris, p. 512.

"Where the consideration for a contract is made
up of several distinct transactions of several parts
some of which are legal while others are illegal,
and the legal portions of the consideration can be
separated from the illegal portion, the contract
will be upheld at least if it contains nothing con-
trary to good morals and nothing for which a
legal penalty is incurred." 6 Ruling Case Law,
682.

"Where a contract is in part illegal and the il-
legal part is separable from the balance the effect
of such illegality is not to render the whole con-
tract illegal, but the courts will recognize and en-
force the legal part; and this is true though the
illegality arises out of the violation of a statutory
prohibition." 15 Am. Eng. Enc. of Law, p. 990.

"When an agreement in restraint of trade con-
tains a stipulation unlimited and in restraint of
trade and another provision which is capable of
being construed divisibly and which is valid the
court will give effect to the latter and will not hold
the agreement void in toto." 2 Elliott on Con-
tracts, 171, Section 847.

"A contract in general restraint of trade is
illegal and void. Agreements in restraint of trade,
whether under seal or not, are divisible. Where
one part thereof is void as being in restraint of

trade, while the other is not, the court will give effect to the latter, and will not hold the agreement void altogether.'' *Oregon Steam Navigation Co.* v. *Winsor et al.*, 20 Wall., 64-72, 22 L. Ed., 315.

"That contract between labor union and employer, providing for use of union stamp and for employment only of union members, contains provisions which court of equity in its discretion would not enforce by specific performance, does not render the entire contract illegal or voidable.'' *Goyette* v. *Watson Co.*, 245 Mass., 577, 140 N. E., 285.

In 117 Am. St. Rep., commencing on page 493, a note of some 40 pages may be found discussing this proposition and citing many authorities.

"If any distinct note that either mortgage was given in part to secure, was not tainted with the fraudulent purpose to defraud the maker's creditors, no doubt equity would follow the law and enforce to that extent the mortgage security.'' *McQuade* v. *Rosecrans*, 36 Ohio St., 442.

See, also, *Ohio, ex rel.*, v. *Board of Education*, 35 Ohio St., 519, and *Widoe* v. *Webb*, 20 Ohio St., 435, 5 Am. Rep., 664.

It follows that after eliminating from the contract the provisions for a closed shop, it still remains legal and enforceable in its provisions for arbitration, and an arbitration entered into is not thereby made abortive, in my opinion. In this and following propositions I am not able to accept the conclusions of the majority opinion.

It is claimed in behalf of the company that the award is void and unenforceable because of the withdrawal of arbitrator Higley. It was provided in the contract:

"The finding of the majority of said board of arbitrators to be final and binding upon the parties hereto."

Under such submission the law is stated in 5 Corpus Juris, 100, Section 218, as follows:

"The refusal of one or a minority of the number of arbitrators, having authority to render a majority award, to proceed further with the hearing or discussion of the case, after a discussion has arisen, does not divest the majority of the power to proceed in the absence of the minority, with the hearing and to render an award in accordance with their authority."

And in 2 Am. Eng. Enc. of Law, at page 645, it is said:

"When the submission provides for the appointment of two arbitrators, who are to choose a third to act with them, if one of the arbitrators, for any reason, stays away from the meeting, unless it be by fraud on the part of the other arbitrators or the parties, after he has received due notice, and has been given an opportunity to attend, the others may decide without him, and their award will be upheld."

It was held in a local case, where it was claimed that the award was void by reason of one of the arbitrators withdrawing from completing his portion of the work:

"The contract provides how the arbitrators shall be appointed: 'That they or any two of them shall arbitrate, award, order, judge, and determine of and concerning the same.' This the two remaining arbitrators did, and by the contract were fully authorized to do." *Sandrowitz* v. *Sandrowitz.*

"Under such a submission (where it is to three arbitrators and an award by any two of them to be binding), it will be sufficient for any two of them to act jointly, though the third absents himself from the meetings, provided he has full notice and opportunity of being present at them if he pleases, and is not kept away by any practice of the other arbitrators or parties." Russell on Arbitration and Award, 425.

While some authorities are found to the contrary, the rule seems to be well settled that the withdrawal of an arbitrator does not avoid the award where a majority are sufficient to act by the terms of submission. The environments in the instant case indicate the appropriateness of this rule. Arbitrator Higley, by his own statements, regarded himself as the advocate of the company, by whom he was chosen. After the evidence was all submitted, the arbitrators considered the issues to the extent of finding that a majority were in favor of granting an increase of wages. An adjournment then followed. Arbitrator Higley hastened to secure a conference with the officers and attorney of the company, where the situation was considered at length. Higley thereafter refused to participate as arbitrator, and the company took further action in an attempt to avoid the award. It is a reasonable conclusion that Higley did not further participate, with the approval of the company, and as the result of a scheme devised by the officers and attorney of the company and Higley to avoid an award which they then knew to be adverse. The company should not be heard to complain of a condition created by it.

It is further claimed in behalf of the company that the award is void and unenforceable by reason of the written notice given by the officers of the company to the union May 30th (Defendant's Exhibit No. 9), and the written notice contained in a resolution of the board of directors of the company served upon the arbitrators and the union June 2d (Defendant's Exhibit No. 10). The letter of May 30th (Defendant's Exhibit No. 9) was an objection of the company to further participation in the arbitration by arbitrator Holcomb, because of his alleged misconduct, but contained no suggestion of withdrawal from the arbitration.

The contract provided for a submission of differences to three arbitrators, but this provision was modified by the parties to the extent of agreeing to a submission to five arbitrators, two of whom were primarily chosen by each side, and Holcomb later agreed upon as the fifth arbitrator.

The letter of June 2d contained a copy of a resolution of the directors of the company, in which it was resolved that the company withdrew from the arbitration and would not further be bound by any award made thereby, because, as further appears from the resolution, of the notice claiming disqualification of Holcomb and refusal of the union to meet and select a new board. A proposition is now presented as to whether the company could or did withdraw from the arbitration and thereby render the award void.

It has been a generally recognized rule of common law that a party may revoke a submission to arbitration at any time before an award has been made. This rule, in early times, grew out of the

jealousy of the common-law judges of their jurisdiction, and out of their fear lest encroachments might be made thereon, while in the modern view and practice the settlement of disputes by arbitration is encouraged by the courts, and every reasonable intendment and presumption is in favor of their finality. *Toledo S. S. Co.* v. *Zenith Co.*, 184 F., 391-396, 106 C. C. A., 501; Morse on Arbitration, 436, 437; 3 Cyc., 586; 5 Corpus Juris, 20; *Corrigan* v. *Rockefeller*, 67 Ohio St., 354, 66 N. E., 95.

This dislike of arbitrations which permitted such revocation was because of the parties thereby taking full jurisdiction and control of disputes to the deprivation of the courts. The reason for the rule did not exist where the whole of a controversy was not submitted to arbitration, but only certain propositions were first determined by arbitration, and the final decision was then submitted to the courts. The reason of the rule never applied to such conditions.

"Where an agreement for arbitration by three arbitrators provided for an award by two, the fact that one refused to sign the award or to participate in a further ascertainment of damages which the submission required did not invalidate the award or the subsequent proceeding for ascertaining damages." *Toledo S. S. Co.* v. *Zenith Co.*, *supra*.

A distinction is recognized in the authorities between arbitrations which include the whole issue and those which involve only a proposition therein. A common illustration of this is an appraisal, so-called, by which a question of value, for instance, is determined. *Omaha Water Co.* v. *City of*

*Omaha,* 162 F., 225, 89 C. C. A., 205, 15 Ann. Cas., 498; 5 Corpus Juris, 17. The distinction between arbitrations is recognized in *Sebree* v. *Board of Education,* 254 Ill., 438, 98 N. E., 931, where it is said that appraisers are selected to prevent disputes.

"The distinction  *  *  * of such a question [fixing of value on appraisement] and one involving judicial functions is of vital importance, because the latter may be revoked at common law, while the former cannot be." *Toledo S. S. Co.* v. *Zenith Co., supra.*

"When such reference [to fix values, etc.] is one of the stipulations of a contract founded on other and good considerations, differs in many respects from an ordinary submission to arbitration it is not revokable." *Palmer* v. *Clark,* 106 Mass., 373-389.

"The same has been held true where the arbitration is a mere incident to the general contract as a provision in a building contract providing for payment in accordance with the certificate of a designated engineer or architect." 2 Ruling Case Law, 367.

In 47 L. R. A. (N. S.), at page 382, the rule supported by many authorities is stated as follows:

"All agreements to submit to the judgment and decision of third persons, as prerequisites to litigations, questions that relate merely to prices, values, sums recoverable, amounts of losses or damages payable, quantities, or quality,—all of which come under the category of auxiliary, collateral and incidental issues,—are considered not to oust the courts of their jurisdiction, and when not

waived or abrogated, are respected and enforced judicially as valid and effectual.''

See, also, *Insurance Co.* v. *Ries,* 80 Ohio St., 272, 88 N. E., 638; *Myers* v. *Jenkins, Admr.,* 63 Ohio St., 101-120, 57 N. E., 1089, 81 Am. St. Rep., 613.

The matters submitted to arbitration in the instant case did not involve any existing liability of either party to the other; neither had a right of action against the other. No recourse could be had to the courts. The reason of the revocability of arbitration did not exist. The parties contemplated a continuance of their relations of employer and employees in the ensuing year, to commence May 1, 1924, and in compliance with their contract sought and entered into a consideration and determination, by submission to arbitrators, so-called, of what, under the attending circumstances, would be a fair and just compensation to the conductors and motormen for the services to be rendered by them in the future. It was in effect an appraisal of the value of their work, and was in fact an appraisal rather than an arbitration, and was a submission in which a right of revocation did not exist by the withdrawal of a party. The right to impeach an award for fraud or other recognized cause is not considered under this issue. The right of a party to withdraw, under the circumstances involved in this case, where there had been a submission of all the evidence and a consideration to the extent of a determination that the award would be unfavorable to the company, is denied by many authorities.

''It is well settled by a long line of decisions in this state that where an agreement partakes of the

nature of a contract whereby important rights are gained and lost reciprocally and submission is the moving consideration of these acts the submission can be revoked only by mutual consent." 5 Corpus Juris, 56.

A large number of authorities are cited in support of this text. *Jones* v. *Enoree Power Co.,* 92 S. C., 267, 75 S. E., 452, Ann. Cas., 1914B, p. 293. No right to revoke exists after submission under the statute. *Carey* v. *County Commrs.,* 19 Ohio, 245; *County Commrs.* v. *Carey,* 1 Ohio St., 463. The matters submitted to arbitration did not involve an existing liability, one which could be determined in the courts, but only a determination of the value of the services to be rendered in the future.

A submission to arbitration is the only feasible recourse of employer and employees under similar conditions, and if an employer may, at will, arbitrarily withdraw from a submission agreed upon, and protracted litigation ensues, as in this case, past a long period of employment, wages for which have been fixed by such arbitration, a situation abhorrent to a sense of justice is presented.

The conclusion upon this proposition is that the award was not avoided by the attempted withdrawal of the company from the arbitration.

This brings us to the final proposition whether, as claimed by the company, the award should be impeached for fraud or misconduct on the part of the union, or on the part of the arbitrator Holcomb. This is perhaps not a very important matter to be considered herein, as it depends largely upon the weight to be given to the conflicting evidence, and

the issue is held affirmatively by the majority of the court. It is said in *Corrigan* v. *Rockefeller*, 67 Ohio St., 354-367, 66 N. E., 95, 98:

"The law favors the amicable adjustment of difficulties, and arbitration has been favored by the courts in this state from early times. It is considered that arbitrators are constituted by the parties chancellors, judges and jurors, having jurisdiction of the law and of the facts. In general the award is final. The reason is obvious. By procurement of the parties whose cause is in court, a tribunal other than that provided by the ordinary processes of law, has been substituted. The very purpose is to reach, in a speedy and inexpensive way, a final disposition of the controversy between them, and to avoid future litigation concerning the same matters. It is in furtherance of this purpose that, by the general rule, the award cannot be overturned by the dissatisfied party. And so the rule is that it cannot be impeached for error; nothing but fraud, in the parties or in the arbitrators, or such manifest mistake as naturally works a fraud, can be alleged to avoid it. Such is the holding in *Ormsby* v. *Bakewell*, 7 Ohio, 98. See, also, *Rice* v. *Hassenflug*, 45 Ohio St., 377 [13 N. E. 655]. Morse on Arbitration, 47, 49, 59, 293, 296, to the effect that courts construe the act of arbitrators with liberality, and with an inclination to support arbitration where substantially regular, and that an award covering the issues, made in good faith upon a full hearing, and in obedience to the submission, is final."

The award is not void because of improper procedure, but only voidable for fraud and misconduct, which must be established affirmatively by the com-

344 OHIO APPELLATE REPORTS.

Polk v. Clev. Ry. Co.  [20 Ohio

pany. 2 Ruling Case Law, 389. Every presumption is in favor of the award. 2 Ruling Case Law, 391.

It is claimed by the company that there was fraud on the part of the union in the selection of arbitrator Holcomb, and in exerting an influence upon him, and also on the part of Holcomb in accepting the position of arbitrator, and in his conduct while acting as such, all of which is denied by the union. Holcomb had become, or purposed to become, a candidate for appointment to the position of collector of the port at Cleveland, without public announcement of that fact, however, and had solicited the support of the union through Secretary Rea, without knowledge that he would be selected as an arbitrator, which solicitation was favorably received by Mr. Rea. Later, after Holcomb had been selected, Rea and Owens, president of the Cleveland Federation of Labor, at request of Rea, wrote letters to the two Ohio senators recommending the appointment of Holcomb. It is not apparent that Holcomb knew that these letters had been written. It is also claimed that in thus asking the indorsement or support of the union Holcomb placed himself under an inducement to reciprocate, and that he did so attempt to do by favoring the union in the arbitration. Thus an inference is drawn of bad faith and partiality, but it is not a necessary inference, and such deduction may not be true in fact. James Holcomb had been traction commissioner for two years. His conduct and reputation were well known to both parties. He might have been looked upon as a good man for the position to which he aspired, without expectation on the part of the union of a return of the favor, and

without thought of improper obligation on his part. And he may not have had any idea of wrongfully favoring the union because it looked with favor upon his candidacy. It is usual for candidates for office to solicit the support of influential persons and organizations, without which success may not be attained, without thought of improperly reciprocating the favor, and candidates ordinarily resent any thought of rewarding such support when it would be stultifying. Such inference does not justify a finding of such fact.

It is claimed that Holcomb, while traction commissioner, abstracted some papers from the company's files, indicating an irregularity on the part of some persons in the employ of the company. This is said to indicate an attitude of hostility to the company. The explanation is attempted to be made by Holcomb that there was irregularity to which he called the attention of Mr. Stanley, the president of the company, who corrected the condition, and the ill will of such persons was thus incurred, against which Holcomb sought protection.

Further complaint is made in that it is claimed that arbitrator Bernsteen, chosen by the union, said that if Holcomb was selected he would guarantee not less than 10 cents an hour in raise of wages. This is asserted because of language to that effect in an affidavit of William Polk, president of the union, secured by the company. Polk repudiates this in his evidence, and says that he did not intend to be so understood. Bernsteen is said to have made this statement to George Rees, both of whom deny the truth of this assertion. If this statement was established and connected with Holcomb, no doubt it would go far in supporting the company's

claim, but the company does not sustain its burden to prove it.

Further, it is urged that "arbitrator Holcomb and Bernsteen and Hayes refused to consider the evidence and based the pretended award on matters entirely extrinsic to the evidence." It is further claimed that Holcomb declined to consider matters in evidence relating to the inability of the company to pay higher wages, by reason of its financial condition, the necessity for extensive repairs, the lack of authority under the ordinance to increase fares, and other matters of like import, and that he insisted upon discussing other matters outside of the evidence regarding the asserted ability of the company to reduce expenses by changes suggested, by eliminating waste, and otherwise. This is given by arbitrator Higley as actuating him to withdraw from the arbitration, suggesting further that the company was without opportunity to defend itself against such claims. It may be here suggested that the declarations made by arbitrators as to what took place in their deliberations were incompetent, should not have been admitted, and ought not to be considered. *Corrigan v. Rockefeller, supra.*

The statements attributed to Holcomb were evidently responsive to statements made by Higley, and perhaps by Schmidt, regarding the inability of the company to pay higher wages for the reasons suggested, which also was incompetent evidence. The wages should be measured by the services performed, considering the cost of living and wages generally, and not by the wealth of the company.

It is not apparent that such conversation was prejudicial or influenced the findings made. The amount of the award may be considered in deter-

mining whether it was the result of corrupt conduct. 5 Corpus Juris, 191. Of the 27 requests made only two were granted, and they only in part. The men were allowed 15 minutes time for making outside reports, and an increase in wages of 12 cents an hour, the highest available wage being 72 cents an hour, which was certainly not unfair considering the wages in other lines of activity and the cost of living.

Finally, it is claimed that statements made at Rice Lake, Canada, by Holcomb, indicate hostility on his part and tend to establish fraud. A scheme was devised by which Holcomb was invited to be the guest of some one at Rice Lake, for a fishing vacation, and he met other men there, introduced as business men from New York, two of whom now claim to be stenographers. A dictaphone had been installed, and a record was produced of what Holcomb and others were claimed to have said when led into discussion during convivial hours concerning the dispute between the company and the union. The record produced is so unspeakably vile, profane, and indecent that the common pleas court wholly rejected it, and it has obtained but little weight in this court. That a man of Holcomb's standing and ability should use such language is difficult to believe. It was an entrapment, discreditable to its promotors in design and execution. The correctness of the report and the language claimed to have been used are denied by Holcomb and others present. This took place three months after the arbitration, during which time Holcomb had been subject to criticism by the company, and the sentiments then entertained by him had much time for development after the arbitra-

tion.   Whatever the fact may be as to what he then said, the report does not indicate expression by him of unfairness or favoritism during the arbitration.

In the multiplicity of matters in the long trial and extended argument, it is not improbable that some things claimed have not been mentioned herein, but reference has been made to the salient propositions.   There are conditions involved not commendable, and subject to criticism, but fraud or misconduct is not shown sufficiently in fact, or weight of evidence, to justify an impeachment of the award.

By the decision of this case the employees are without a tribunal where an adjustment can be made of the amount of wages they should have received during the year following the submission to arbitration, and which was concededly a proper matter for determination.   Mindful of the maxim of equity that for every wrong there is a remedy, the final conclusion is reached that the award should be enforced.