******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CHRISTOPHER J. HAMER ET AL. *v.*
MARIAN BYRNE ET AL.
(AC 46367)

Alvord, Elgo and Clark, Js.

*Syllabus*

The plaintiffs appealed from the judgment of the trial court finding, inter alia, that they had not proved their cause of action for adverse possession of certain property owned by the defendant M. The plaintiffs own real property on Evergreen Avenue in Westport, with a rear property line that abuts the property of M, who installed a stockade fence along that property line. M owns the strip of land along Evergreen Avenue that provides access to M's property, the plaintiffs' property, and to the property of the defendant J, that is located across the access strip from the plaintiffs' property. The access strip is encumbered by deed language that provides the plaintiffs and J with rights over the access strip for purposes of ingress and egress and for all purposes for which a public highway can be used. The plaintiffs claimed, inter alia, that the court erred in its determination that the fence erected between the properties by M was not a spite structure. The defendants M, and her two adult children P and R, cross appealed from, inter alia, the trial court's judgment for the plaintiffs on the count of their counterclaim, that alleged that the actions of the plaintiff C constituted the commission of a prima facie tort. *Held*:

The trial court did not err in rendering judgment for M on the plaintiffs' cause of action asserting the erection of an alleged spite fence, as the court properly concluded that the plaintiffs failed to sustain their burden of proof with respect to all of the elements necessary to state a cause of action under the statutes (§§ 52-480 and 52-570) governing the malicious erection of a structure.

The trial court did not err in concluding that three fixed objects located near Evergreen Avenue and within the access strip, namely, a fence erected by J and mailboxes owned by J and M, did not materially and substantially interfere with the plaintiffs' use and enjoyment of their easement rights, as the plaintiffs were still able to use the access strip for ingress to and egress from the dominant estate and they failed to demonstrate that the three fixed objects interfered with their reasonable use or expansion of the access strip as a public highway.

The trial court's finding that the plaintiffs failed to establish by clear and convincing evidence their claim of adverse possession of a strip of land between their property and M's property was not clearly erroneous.

The trial court did not err in rendering judgment for C on the count of the counterclaim brought by M, P and R that alleged that C committed a prima

facie tort, because, even assuming that Connecticut recognizes prima facia tort as a viable cause of action, the alleged conduct was adequately governed by existing torts and was similar to the elements necessary to establish the traditional torts of intentional and/or negligent infliction of emotional distress and M, P and R conceded that they failed to prove the element that any emotional distress that they suffered by C's conduct was severe.

The trial court did not improperly award only nominal damages to P and R with respect to the count of their counterclaim alleging vexatious litigation against C with respect to a prior action that C had brought in 2019 that the court found was vexatious as to P and R, as the court based its award on evidence that established that neither P nor R incurred attorney's fees defending themselves in the prior action and they failed in their burden of proving the nature and extent of their loss for compensatory damages.

Argued October 22, 2024—officially released March 4, 2025

*Procedural History*

Action seeking, inter alia, a permanent injunction, and other relief, brought to the Superior Court in the judicial district of Bridgeport, where the named defendant et al. filed a counterclaim; thereafter, the case was tried to the court, *Hon. Robert L. Genuario*, judge trial referee; judgment in part for the defendants on the complaint and judgment in part for the plaintiffs on the counterclaim, from which the plaintiffs appealed and the named defendant et al. cross appealed to this court. *Affirmed.*

*Edward N. Lerner*, with whom, on the brief, was *George K. Guarino*, for the appellants-appellees (plaintiffs).

*Alan R. Spirer*, for the appellees-appellants (named defendant et al.).

*Joseph R. Ciollo*, for the appellee (defendant Janis Melone).

*Opinion*

ALVORD, J. This appeal centers on three adjacent properties located in Westport. The plaintiffs, Christopher J. Hamer and Cynthia Hamer, appeal from the

judgment of the trial court rendered in favor of the defendants, Janis Melone, Marian Byrne, Jack Precious, and Rachel Precious, on all but one portion of one count of the plaintiffs' cause of action.[1] In their appeal, the plaintiffs claim that the court erred in (1) denying the plaintiffs' claim that Marian improperly erected a spite fence; (2) not awarding the plaintiffs damages in connection with the construction of the spite fence; (3) not ordering the removal of Janis' mailbox, Janis' fence, and Marian's mailbox from the easement area; and (4) finding that the plaintiffs had not sustained their burden and proven their cause of action for adverse possession. The Byrnes cross appeal from the judgment of the court, rendered in part in favor of the plaintiffs, on the Byrnes' counterclaim. In their cross appeal, the Byrnes claim that the court erred in (1) failing to find that Christopher's actions constituted the commission of a prima facie tort and (2) awarding only nominal damages to Rachel and Jack with respect to their vexatious litigation claim. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. To aid the reader, we include a reproduction of a trial exhibit (plaintiff's exhibit 32), an aerial photographic image of the properties at issue, as an appendix to this opinion. This dispute involves parties who own three adjacent parcels located on Evergreen Avenue in Westport. Marian owns a 2.5 acre parcel (Byrne property), the majority of which is located

---

[1] In the interest of simplicity, we refer to Christopher Hamer, Cynthia Hamer, Janis Melone, Marian Byrne, Jack Precious, and Rachel Precious individually by their first names. We refer to Christopher and Cynthia collectively as the plaintiffs. Also, we refer to Janis, Marian, Jack, and Rachel collectively as the defendants. Janis' name has been spelled as both Janice and Janis in various documents in this case; for convenience, we use the spelling that is consistent with the summons and complaint. Further, we refer to Marian, Jack, and Rachel, all of whom live on the Byrne property, collectively as the Byrnes.

The plaintiffs also named Ryan Verlin and Nicole Vines Verlin as defendants but subsequently withdrew the action as to them.

behind the two other lots that are on Evergreen Avenue. Marian now resides with her adult children, Rachel and Jack, on the Byrne property. Marian holds title to a strip of land, which is 27.7 feet wide along Evergreen Avenue and is 187 feet long (access strip). The access strip provides access to the three properties at issue here.

Christopher and Cynthia own a parcel (Hamer property) that lies between the bulk of the Byrne property and Evergreen Avenue. The Hamer property lies adjacent to the access strip. Janis owns a property (Melone property) on the opposite side of the access strip from the Hamer property. The rear property line of the Hamer property abuts the property line of the Byrne property for approximately ninety-five feet. The access strip owned by Marian is encumbered by deed language which provides the plaintiffs and Janis with rights over the access strip "for purposes of ingress and egress and all purposes for which a public highway can be used."

There is a brook and a pond on the Byrne property. The residential building and the bulk of the Byrne property is mostly located on the south side of the pond. The land on the north side of the pond abuts the Hamer property and other properties located on Evergreen Avenue. There is a drop in elevation between the property line that divides the Hamer and Byrne properties and the brook and pond. Similar to other properties fronting on Evergreen Avenue, there exists significant vegetation, including shrubbery, deciduous trees, and brush, on the land between the Hamer property and the brook and pond.

The Hamer property has a view of the pond and the Byrne property (to the south of the pond). The view of the pond from the Hamer property varies by season: there is less obstruction of the view at times of the year when there are fewer leaves on the vegetation between

the pond and the Hamer property than seasons when the vegetation is thriving. The view enhances the enjoyment of the Hamer property.

The Hamer residence is located toward the northern side of their property, which allows space for a side yard and a paved driveway area immediately abutting the access strip. There is a garage on the Hamer property, which is located toward the back of the property and abuts the access strip. An area of the Hamer property that lies between the garage and the Byrne/Hamer property line is used at various times for storing personal property.

"Marian and her family have lived on the Byrne parcel and Marian has owned an interest in the Byrne parcel since 1995. [Janis] has owned her property since 1988, however, she moved out of the property and began renting it approximately around 2007 or 2008. "The plaintiffs have lived on the Hamer property since 2017. Cynthia was the sole titleholder until 2020, when she quitclaimed an interest in the Hamer property to Christopher.

"In 2019, [Christopher], alone, brought an action against Marian, Rachel, Jack, [Janis] and two of [Janis'] tenants. [Christopher] was self-represented at the time he brought the action. The 2019 action by [Christopher] alleges many of the facts that are the basis of the subject action brought by [the plaintiffs] against the same defendants. . . . Subsequent to the filing of the 2019 action, the [plaintiffs] retained counsel. Rather than amending the complaint and pleadings filed by the self-represented [Christopher], counsel, on behalf of [Christopher], withdrew the 2019 action and began the subject action."

In July, 2020, the plaintiffs commenced the present action. The complaint alleged the following: in count

one, the plaintiffs acquired, by virtue of adverse possession, a strip of land between the Hamer and Byrne properties; in count two, the defendants interfered with their easement rights; in counts three and four, Marian constructed a spite fence; in counts five and six, the plaintiffs are entitled to damages and equitable relief by way of an injunction against the Byrnes for wrongful acts committed on the Hamer property; and, in count seven, the Byrnes spoliated evidence. The Byrnes filed a counterclaim alleging, in counts one through six, that an action filed by Christopher in 2019 was vexatious and brought without probable cause, entitling them to damages, and, in count seven, that Christopher committed wrongful acts directed against them which "constitute the commission of a prima facie tort."

Following a trial to the court, *Hon. Robert L. Genuario*, judge trial referee, the court issued a memorandum of decision in which it rendered judgment "in favor of Marian on counts one, three and four of the [plaintiffs'] complaint"; "in favor of Marian, Rachel, and Jack on counts five, six and seven of the [plaintiffs'] complaint"; "in favor of the [plaintiffs] and against Marian on the second count of the [plaintiffs'] complaint, only in so far as it order[ed] Marian to remove the pole in the location of the former utility pole and relocate her mailbox" adjacent to Janis' mailbox; "in favor of [Janis], Rachel, and Jack on the remaining claims of the second count"; "in favor of Marian, Rachel, and Jack on the seventh count of the [plaintiffs'] complaint"; "in favor of the [plaintiffs] and against Marian on counts one and two of her counterclaim"; "in favor of Rachel and Jack on counts three, four, five and six respectively on their complaint," in addition to awarding "damages of $1 on each count to each Rachel and Jack"; and "in favor of the [plaintiffs] on the seventh count of the counterclaim

. . . ."[2] This appeal and cross appeal followed. Additional facts will be set forth as necessary.

## I

### THE PLAINTIFFS' APPEAL

On appeal, the plaintiffs claim that the court erred in rendering judgment in favor of the defendants on the plaintiffs' cause of action asserting the erection of a spite fence, adverse possession of a parcel, and encroachment on an easement. We address each in turn.

### A

The plaintiffs first claim the court erred in rendering judgment in favor of Marian on the plaintiffs' cause of action regarding her alleged spite fence. Specifically, they argue that the court, in determining that Marian did not construct a spite fence, erred by failing to find that the fence was constructed maliciously, is intended to injure the enjoyment of the plaintiffs' land, and is useless to Marian. Marian responds that the evidence adequately supports the court's findings. We agree with Marian.

We begin by setting forth the relevant standard of review that guides our analysis of the plaintiffs' claim. "When the factual basis of a trial court's decision . . . is challenged, our function is to determine whether, in light of the pleadings and evidence in the whole record,

---

[2] In a separate action, which was later consolidated in the trial court, Marian asserted four counts in her complaint alleging "that she has acquired by way of prescriptive easement the right to travel over a corner of the Hamer property." The plaintiffs asserted four counts in their counterclaim, which the court found to be duplicative of many of the counts asserted in the plaintiffs' complaint. The court rendered its "judgment in favor of the [plaintiffs] on the first, second, third and fourth count of the Byrne complaint," and the court rendered "judgment in favor of Marian on the first, second, third and fourth count on the counterclaim."

these findings of fact are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Errichetti* v. *Botoff*, 185 Conn. App. 119, 125, 196 A.3d 1199 (2018).

The following additional facts, as found by the trial court, are relevant to the plaintiffs' claim. In 2019, Marian applied for and received a permit from the Westport Conservation Commission (conservation commission) to install a fence along a portion of the property line between the Hamer property and the Byrne property. Once the permit was issued, Marian installed a stockade fence along that property line. This eight foot tall wood fence is similar, in size and material, to that installed by the plaintiffs along one of their property lines. The fence blocks the view of the pond and brook on the Byrne property from at least the ground level of the Hamer property. Appraisers found that the fence impairs the value of the Hamer property because it blocks the view of the pond. The plaintiffs' enjoyment of their property was impaired by eliminating this view, as well.

The following legal principles are relevant to our resolution of this claim. "The Connecticut progenitor of what have commonly been called the spite fence cases appears to be *Whitlock* v. *Uhle*, 75 Conn. 423, 53 A. 891 (1903). . . . In [*Whitlock*], our Supreme Court construed and applied the predecessors to General Statutes §§ 52-480 and 52-570 and set forth the elements necessary to state a cause of action under §§ 52-480 and 52-570. The court held that the essential elements are: (1) a structure erected on the [defendant's] land; (2)

a malicious erection of the structure; (3) the intention to injure the enjoyment of the adjacent landowner's land by the erection of the structure; (4) an impairment of the value of adjacent land because of the structure; (5) the structure is useless to the defendant; and (6) the enjoyment of the adjacent landowner's land is in fact impaired. . . . The plaintiff bears the burden of demonstrating each of these elements by a fair preponderance of the evidence." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Errichetti* v. *Botoff*, supra, 185 Conn. App. 125–26.

"Uselessness under § 52-480 focuses on whether the structure serves an actual use, not whether the defendants can merely assert a purpose for erecting the structure. See, e.g. . . . *Harbison* v. *White*, 46 Conn. 106, 109 (1878) (rejecting defense to malice element—that structure screened defendants' premises from persons occupying plaintiff's house—because '[t]o concede this would be to nullify the statute; for it is not possible for malice to conceive any kind or form of structure which would not in some measure protect premises from observation')." (Citation omitted.) Id., 130. "Initially, we note that when determining whether the plaintiff has met his burden with respect to the second and third elements of the *Whitlock* test, the court does not journey deep into the defendant's heart. . . . Whether a structure was maliciously erected is to be determined rather by its character, location and use than by an inquiry into the actual motive in the mind of the party erecting it. . . . Similarly, assessing whether the defendants possessed the requisite intent to injure relates to the thing done, its purpose and effect, and does not depend on the existence or nonexistence of personal spite or ill-will. . . .

"It is quite possible for a structure to bear on its face . . . convincing evidence that it was intended for a legitimate purpose, or that it was intended to injure the

adjacent land and its owner. . . . The intention is not the motive from which it may have sprung, but the established purpose, from whatever motive, to use the land in a manner not justified by its ownership, and forbidden by law. . . . The intent to injure is determined mainly from the fact that the structure does impair the value of the adjacent land and injure the owner in its use, from the absence of any real usefulness of the structure . . . to the defendant, and from the character, location and surroundings of the structure itself . . . . When a structure, useless to the owner, injuring adjacent land and its owner, intended to work such injury, is willfully erected, it is maliciously erected; that is, it is erected in knowing disregard of the law and the rights of others. . . . [O]nce it is established that malice was the primary motive in [the fence's] erection, the fact that it also served to protect the [defendants'] premises from observation must be regarded as only incidental, since to hold otherwise would be to nullify the statutes." (Citations omitted; internal quotation marks omitted.) Id., 127–29.

In its memorandum of decision, the court set forth the six *Whitlock* elements, found facts relating to each, and concluded that the plaintiffs failed to satisfy their burden with respect to three of the six elements. The court found that "the [plaintiffs] have sustained their burden with regard to elements one, four, and six. With regard to element one, Marian erected the structure, a fence, on her property, with regard to element four, there was a testimony of appraisers, which the court finds credible, that the fence, which can best be described as a solid stockade fence, eliminates the view of the pond and, therefore, impairs the value of the [plaintiffs'] property, and six . . . the [plaintiffs'] property has been impaired by eliminating what one witness described as a 'breathtaking view.' (The court does not find the view breathtaking, but it certainly is pleasant.)"

The court then discussed elements "two, the malicious erection of the structure, three, the intent to injure the enjoyment of the adjacent landowner's land by erection of the structure, and five, whether or not the structure is useless to the defendant." The court found that "[i]t cannot credibly be said that a fence is useless to Marian. Indeed, as the [plaintiffs'] witnesses testified, there has always been some confusion as to the property line between the Hamer property and the Byrne property. The fact that the [plaintiffs] have asserted, even unsuccessfully, a claim for adverse possession of property owned by Marian undercuts their claim that a fence marking the actual property line is useless. Marian clearly wishes to give notice to the [plaintiffs] and, indeed, to any subsequent property owners and the world at large as to where the property line exists. A fence further prevents the [plaintiffs] and subsequent owners from occupying the property or utilizing the property." As to the malicious erection of the structure and intent to injure the enjoyment of the plaintiffs' land, the court found that "Marian could have installed a less obtrusive fence such as a picket fence, or a fence of a lower height to accomplish the purpose of defining the property line. . . . While the subject fence may not be as attractive or visually pleasing as the fence along the side yard property line, it is approximately the same height and made of similar material. . . . The difficulty in this case is that the usefulness of the solid stockade fence, based upon the testimony of Marian, Rachel and Jack is to provide privacy, not in general, but frankly from the [plaintiffs]. Indeed, when Marian considered installing a fence at the time the property was owned by the [plaintiffs'] predecessor in title, she had a discussion with that property owner and their disagreements were resolved without the installation of a fence. Much of the testimony in this case surrounded conduct by the [plaintiffs], and in particular [Christopher], that [the

Byrnes] find offensive and conduct by [the Byrnes] that the [plaintiffs] find offensive. The testimony indicates that prior to the fence, the [plaintiffs] did trespass on the contested area. [Christopher] marked trees for removal. [Christopher] tends to walk at night with a bright high-powered flashlight, which he, at times, shines in the direction of the Byrne property. There is frequent activity in the [plaintiffs'] backyard. Between the southside of the [plaintiffs'] garage and the Byrne/Hamer property line, the [plaintiffs] store personal property in what might be described in an unsightly fashion. On one occasion the [plaintiffs] or their children flew a drone over the Byrne property in the area of the Byrne swimming pool where some of the parties were relaxing. There are bright lights on the Hamer garage, [shining] both on the access strip, and also on the south side facing the Hamer/Byrne property line." (Citation omitted.)

On appeal, the plaintiffs argue that the court made erroneous findings as to the usefulness of the fence.[3] They assert that the fence does not prevent light from entering into nor drones from flying above the property, and they contend that the court created "an exhaustive

[3] The plaintiffs also argue that Connecticut courts have analyzed fences in a manner whereby merely a section of the fence may be deemed a spite fence. See, e.g., *Geiger* v. *Carey*, 170 Conn. App. 459, 487, 154 A.3d 1093 (2017); *DeCecco* v. *Beach*, 174 Conn. 29, 30–33, 381 A.2d 543 (1977). However, the plaintiffs' brief, purportedly advancing this argument, wholly lacks any relevant analysis and therefore is inadequately briefed for this court's review. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 611, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d 654 (2021).

laundry list of ostensible 'acceptable' purposes to try and mask [Marian's] real purpose of taking away the [plaintiffs'] view . . . and decreasing the financial value of the Hamer property." The plaintiffs further indicate that the Byrnes' residence is a far distance from the Hamer property and that there exists a lot of vegetation, and a significant elevation drop, between the two properties. In addition, the plaintiffs argue that "[t]here was no evidence at trial that [Marian] had ever raised the issue of any 'personal property' being unsightly or ever sought to cure the issue in any way with [the plaintiffs] prior to constructing the fence." The plaintiffs further contend that the fence fails to actually delineate the boundary between the two properties. Upon review of the evidence in the record, we are not convinced that the court clearly erred in declining to find the fence useless. Notably, the evidence supports the court's finding that the fence addresses the Byrnes' goals to delineate the property line and support their privacy because Christopher tended to trespass and engage in activities on the Byrne property. Accordingly, we conclude that the court's finding that the fence was not useless is not clearly erroneous.

The plaintiffs also argue on appeal that the court made erroneous findings as to the malicious erection of the structure and the Byrnes' intent to injure the plaintiffs' enjoyment of their property.[4] Because the

---

[4] Specifically, they argue that "[t]he trial court erroneously chooses to ignore without precedent or basis in fact that [Marian] weaponized the threat of a fence to remove the water view not only against the [plaintiffs], but those families that had lived in the Hamer house prior to [Marian] even knowing who the [plaintiffs] were." Furthermore, the plaintiffs maintain that the "court heard voluminous evidence, on the record, of how [Marian] has argued, threatened spite fences, verbally assailed minor children who were alone in their own home, caused police involvement, lawyer involvement, wrote her neighbor's real estate broker before they even moved in and made her neighbors fear and avoid her." The plaintiffs contend that the evidence also proves that Marian "was calculated in her attempts to conceal that she was purposefully seeking to wipe out the water view for her neighbor with the fence because she knew it was wrong and maliciously designed."

court found the fence useful, both in its purpose and effect, the court did not err in finding that there lacked an intent to injure. See, e.g., *DeCecco* v. *Beach*, 174 Conn. 29, 32, 381 A.2d 543 (1977) ("intent to injure is determined . . . [inter alia] from the absence of any *real* usefulness of the structure" (emphasis added)). Other evidence the trial court considered regarding the character and location of the fence, including the fact that the fence is similar to one installed by the plaintiffs along another property boundary, further supports the court's conclusion that the fence was not maliciously erected. Upon review of the evidence and in giving "every reasonable presumption . . . in favor of the trial court's ruling," we are not "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Chase & Chase, LLC* v. *Waterbury Realty, LLC*, 138 Conn. App. 289, 296, 50 A.3d 968 (2012).

In sum, the court did not err with respect to any of the findings challenged by the plaintiffs in connection with the second, third, and fifth *Whitlock* elements, i.e., malice, intent to injure, and uselessness of the structure. We therefore affirm the court's conclusion that the plaintiffs did not sustain their burden of proof as to all of the elements necessary to state a cause of action under §§ 52-480 and 52-570.[5]

The plaintiffs further argue that the evidence demonstrates that Marian knew the fence would seriously injure the plaintiffs' enjoyment of their property. In addition, the plaintiffs contend that a less obtrusive fence could have been constructed by Marian and that the court "incorrectly states that the fence is made of the same material when in fact the evidence on the record shows that the Byrne's fence material is not the same."

[5] The plaintiffs also claim that the court erred in not awarding the plaintiffs damages relating to the spite fence. Specifically, they argue that "[t]he evidence at trial established that significant damage was caused to the Hamer property during and as a result of the installation of the spite fence that took place on May 14 and May 15, 2019." They contend that the fence diminished the value of their house and their enjoyment of their property. The plaintiffs failed to sustain their cause of action under § 52-570, and the court did not clearly err by not awarding damages.

B

The plaintiffs next claim that the court erred in failing to order the removal of Janis' mailbox, Janis' fence, and Marian's mailbox from the easement area. They contend that these fixed objects interfere with their use and enjoyment of the easement guaranteed by their deed, which allows the plaintiffs to use the easement for ingress or egress and other purposes for which a highway can be used. We are not persuaded.

Before we reach the merits of the plaintiffs' claims, we first set forth our standard of review and fundamental principles of law governing easements and the construction of deeds. "[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is . . . plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences. . . . In contrast, [t]he determination of [the] reasonableness [of the use of an easement] is for the trier of fact. . . . This court [has] observed that review of the court's conclusion that [certain] plantings violated . . . easement rights involves a mixed question of fact and law. [S]o-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *57 Broad Street Stamford, LLC* v. *Summer House Owners, LLC*, 184 Conn. App. 834, 840–41, 195 A.3d 1143 (2018).

"It is well settled that [a]n easement . . . obligates the possessor not to interfere with the rules authorized by the easement. . . . [T]he benefit of an easement . . . is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. . . . [E]asements are not ownership interests but rather privileges to use [the] land of another in [a] certain manner for [a] certain purpose . . . . In determining the character and extent of an easement created by deed, the ordinary import of the language will be accepted as indicative of the intention of the parties, unless there is something in the situation of the property or the surrounding circumstances that calls for a different interpretation. . . ." (Internal quotation marks omitted.) *Freidheim* v. *McLaughlin*, 217 Conn. App. 767, 778–79, 290 A.3d 801 (2023). "The use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit. . . . Ordinarily when [judicial] opinions speak of the use of an easement, it arises in right-of-way cases. Thus use frequently involves the amount of traffic over the easement or alterations to the land to make it passable. . . . This is not to overlook, however, that [t]he owner of an easement has all rights incident or necessary to its proper enjoyment, [although] nothing more." (Internal quotation marks omitted.) *Williams* v. *Green Power Ventures, LLC*, 221 Conn. App. 657, 670, 303 A.3d 13 (2023), cert. denied, 348 Conn. 938, 307 A.3d 273 (2024).

We begin our analysis by identifying the plaintiffs' rights under the easement. Marian's ownership of the access strip is subject to the rights of the owners of the Hamer property to utilize "the strip of land measuring 27.70 feet by 180 feet adjoining Evergreen Avenue as shown and depicted on Westport Town Clerk Maps 6750 and 8585 for purposes of ingress or egress and all purposes for which a public highway can be used." The

easement thus sets forth the right to use the burdened property for two particular purposes. See *Zirinsky* v. *Carnegie Hill Capital Asset Management, LLC*, 139 Conn. App. 706, 717, 58 A.3d 284 (2012) ("an easement generally authorizes limited uses of the burdened property for a particular purpose" (emphasis omitted; internal quotation marks omitted)). Specifically, it serves (1) the purpose of ingress to or egress from the dominant estate and (2) all purposes for which a public highway can be used.

The following additional facts, which reasonably could have been found by the court, are relevant to the plaintiffs' claim. The access strip is 27.7 feet wide and 180 feet long.[6] A portion of the access strip is paved. The paved portion is about ten to twelve feet wide, except it is slightly wider where it turns into the Hamer and Melone properties. A small part of the paved portion extends onto the front southerly corner of the Hamer property. The following structures were located near Evergreen Avenue and within the access strip at the time when the plaintiffs purchased the property: a utility pole, Janis' mailbox, and Marian's mailbox. Janis' fence, which was constructed more than thirty years ago, encroaches onto the access strip by a maximum of two feet in some places. Janis' fence is located toward the rear of the Melone property and opposite the Hamer garage and the Hamer parking area. Marian did not object to the fence when it was installed. In 2019, Marian

---

[6] The plaintiffs contend that "the trial court is mistaken about the dimensions of the easement at issue. . . . The easement size is in reality 180 feet by 27.7 feet." We disagree. The court found that "[w]hile the access strip is 27.7 feet wide, the paved portion of the access strip is significantly narrower. The paved portion of the access strip is approximately ten to twelve feet wide, except where it turns into the Hamer property and their parking area, and where it turns to the Melone property and her parking area. A small portion of the paved area continues off the access strip onto the front southerly corner of the Hamer property where it meets Evergreen Avenue." The court's finding is consistent with the record.

granted Janis a written license to continue Janis' use of the access strip for the limited purpose of maintaining the fence. On appeal, the plaintiffs contend that all three of the fixed objects interfere with their rights to use the access strip for ingress, egress, and "all purposes for which a public highway can be used." Specifically, the plaintiffs challenge the court's conclusions that Janis' mailbox did not need to be moved from its current position on the access strip and that Marian's mailbox did not need to be removed entirely from the access strip in order for the plaintiffs to enjoy their easement rights, because both mailboxes "[create] a poor sightline for oncoming traffic."[7] In addition, they challenge the court's finding that the mailboxes and Janis' fence did not violate their easement rights. They argue that the three objects keep them from using the entirety of the easement by "shrink[ing]" the portions of the access strip that they may drive or walk on, in addition to inhibiting them from expanding the width of the paved portion of the access strip.

As an initial matter, we note that nothing in the language of the deed provides for unlimited and "full use" of the access strip, nor does the deed state that fixed objects cannot be placed on the easement. Additionally, and more importantly, evidence admitted at trial established that the plaintiffs are still able to use the access strip for ingress to and egress from the dominant estate, as they are entitled to do under the easement. The plaintiffs have failed to demonstrate that the three fixed objects interfere with their reasonable use or expansion of the access strip as a public highway; to the contrary, the evidence supports the court's conclusion that the

---

[7] The court found that Marian's mailbox was "closer to the paved area of the driveway and a reasonable expansion of the driveway might conflict with the current location of Marian's mailbox." The court ordered Marian to move her mailbox to another location but allowed her to keep the mailbox within the access strip.

objects, which are commonly found on public highways, do not interfere with the plaintiffs' ability to drive and walk on the access strip nor do they inhibit the plaintiffs from expanding the width of the paved portion of the access strip. On the basis of the foregoing, we are not persuaded that the court erred in concluding that the fence and the mailboxes did not materially and substantially interfere with the plaintiffs' use and enjoyment of the easement.

C

The plaintiffs' final claim is that the court erred in determining that the plaintiffs failed to sustain their burden of proving that they adversely possessed a strip of land between their property and the Byrne property. We are not persuaded.

"As a preliminary matter, we note that, [w]hen title is claimed by adverse possession, the burden of proof is on the claimant. . . . The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner. . . . The use is not exclusive if the adverse user merely shares dominion over the property with other users. . . . Such a possession is not to be made out by inference, but by clear and positive proof. . . . In the final analysis, whether possession is adverse is a question of fact for the trier. . . . The doctrine of adverse possession is to be taken strictly. . . .

"Clear and convincing proof of the elements of an adverse possession claim is an exacting standard . . . that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt

in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true . . . . In evaluating a claim of adverse possession under that demanding standard, [e]very presumption is in favor of possession in subordination to the title of the true owner. . . . That presumption is rooted in the recognition that there are no equities in favor of a person seeking to acquire property of another by adverse holding. . . .

"The demanding burden placed on a party claiming adverse possession of the property of another reflects the fact that such actions are disfavored. . . . As the Supreme Court of Ohio explained, [a]dverse [p]ossession represents the forced infringement of a landowner's rights, a decrease in value of the servient estate, the encouraged exploitation and development of land, the generation of animosity between neighbors, a source of damages to land or loss of land ownership, the creation of forced, involuntary legal battles, and uncertainty and perhaps the loss of property rights to landowners with seisin. . . . Accordingly, we have recognized that adverse possession is disfavored. . . . Moreover, [a] successful adverse possession action results in a legal titleholder forfeiting ownership to an adverse holder without compensation. . . . [T]hat is why the elements of adverse possession are stringent." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Mulvey* v. *Palo*, 226 Conn. App. 495, 500–503, 319 A.3d 211, cert. denied, 350 Conn. 902, 322 A.3d 1059 (2024); see also General Statutes § 52-575.

"[T]he question of whether the elements of an adverse possession claim have been established by clear and convincing evidence is a factual one subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there

is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Citation omitted; internal quotation marks omitted.) *Mulvey* v. *Palo*, supra, 226 Conn. App. 503.

In its memorandum of decision, the court found that "the [plaintiffs] have fallen far short of proving their case for adverse possession of the contested strip.[8] Indeed, even if the burden of proof was simply a preponderance of the evidence, the court would conclude that the [plaintiffs] have fallen short.

"Because the [plaintiffs] have occupied the property for less than fifteen years, they seek to demonstrate that not only have they, but that two predecessors in title have exercised such dominion and control over the contested strip that, collectively, they have ousted Marian of possession by an open, visible exclusive possession under a claim of right. One predecessor had purchased the property in 1995. She testified that she and her tenants maintained a lawn area approximately in the area of the contested strip. On cross-examination that witness indicated that such use was with the consent of Marian and her then husband. Some planting may have been done in that strip by some of her tenants. A subsequent owner testified that she had some disputes with Marian and her then husband, and that, at one time during her ownership beginning in 2011, Marian applied to the [conservation commission] for permission to construct a fence. While that owner may have cut the lawn in the contested area, she . . .

___

[8] Specifically, the contested strip is "a strip of land ninety-five feet long and four feet wide adjacent to the title property line between the Hamer and Byrne [properties]."

acknowledge[d] that she did not own the property. Indeed, to the extent she may have mowed the lawn in this narrow strip, which is more visible from the Hamer [property] than from the Byrne property, it was likely with the consent of Marian and not under any claim of right. Indeed, the [plaintiffs] are correct that a property owner can assert a claim of adverse possession by tacking together their ownership with the ownership of prior title holders and demonstrating a continued uninterrupted adverse possession of fifteen years notwithstanding the fact that their ownership was less than fifteen years. . . . Nonetheless, the nature of the activity engaged in by the prior owners, and indeed the [plaintiffs], up until shortly before this lawsuit was initiated, do not evidence the type of activity necessary to establish open, visible and exclusive possession under a claim of right, and without the consent of the owner. The better evidence indicates that Marian consented to any seasonal lawn cutting or planting that was done by prior owners; that she indicated to the prior owners that the contested strip was her property; and that the prior owners accepted such determination. Indeed, the better evidence is that [Cynthia] was informed of the location of the title boundary line at or about the time she purchased the property and accepted that Marian was the owner of the contested strip. The better evidence is that the title holder of the property who sold to [Cynthia] acknowledged with Marian the title property line and did not assert ownership over the contested area. The prior owner communicated to [Cynthia] the actual location of the rear property line.

"This is reflected in a series of emails between Marian and [Cynthia], in which [Cynthia] acknowledges that they have no interest in acquiring any of Marian's property. The statement was [preceded by] discussions concerning the back property line and requests that Marian agree not to put up a fence. All of this evidence is

inconsistent with a claim that the [plaintiffs], coupled with prior owners, have asserted dominion and control over the property necessary to assert a claim of adverse possession." (Citation omitted; footnote added.)

In support of their claim that the foregoing is clearly erroneous, the plaintiffs maintain that they "successfully satisfied all elements of adverse possession and proved [that] they acquired legal possession of the [contested strip]." The plaintiffs contend that the court "erroneously fail[ed] to consider evidence on the record at trial establishing [the plaintiffs'] adverse possession claim." Specifically, they claim that the following supports their adverse possession of the contested strip: Marian applied to the conservation commission to put up a fence, which demonstrates "the adversarial and open nature of [their] acts upon the adverse possession [of the contested strip]"; Marian "testified at trial that [she] did not know who was maintaining the property at issue and she never gave notice to interrupt the possession, maintaining and use of the [contested strip]"; and the plaintiffs "possessed the property as their own, caring for it . . . ."

After a thorough review of the record, we are not left with a definite and firm conviction that a mistake has been committed by the trial court regarding the plaintiffs' failure to prove the demanding standard of their adverse possession claim. See *Skelly* v. *Brucher*, 134 Conn. App. 337, 344, 38 A.3d 261 (2012) ("[t]he mere existence of evidence tending to support a rejected claim of adverse possession does not establish that the court's finding that the claim was not proven by clear and convincing proof is clearly erroneous"). Thus, we conclude that the court's finding that the plaintiffs failed to establish their claim of adverse possession is not clearly erroneous.

## II

## THE BYRNES' CROSS APPEAL

The Byrnes claim in their cross appeal that the court erred in rendering judgment for Christopher on the counts of the Byrnes' counterclaim for prima facie tort and vexatious litigation. We examine each in turn.

## A

The Byrnes first claim that the court improperly declined to adjudicate the count of their counterclaim for prima facie tort. Specifically, the Byrnes argue that the trial court erred in rejecting their claim that Christopher committed prima facie tort. We are not persuaded.

We begin with our standard of review. Because this claim challenges the trial court's conclusion of law, "our review is plenary and we must decide whether [the court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *New Haven* v. *G. L. Capasso, Inc.*, 151 Conn. App. 368, 371, 96 A.3d 563 (2014).

The following facts are relevant to the Byrnes' counterclaim. In the seventh count of their counterclaim, they allege that Christopher "has committed the following wrongful acts directed at the defendants [Marian] . . . [Rachel] and [Jack]:

a. [Christopher] has repeatedly screamed obscenities at [Marian] and her children;

b. [Christopher] shines floodlights and directs flashlight beams into the windows of the Byrne house;

c. [Christopher] shines floodlights from dusk until dawn which lights cause annoyance and disturbance to [the Byrnes];

d. [Christopher] has cut trees and bushes on the Byrne premises;

e. [Christopher] has destroyed areas of the driveway;

f. [Christopher] has spray-painted trees on the Byrne premises;

g. [Christopher] has dumped debris in the wetland areas of the Byrne premises;

h. [Christopher] has operated his car on unpaved areas of the Byrne premises creating an unsightly and muddy condition;

i. [Christopher] has obstructed [the Byrnes'] use of the driveway;

j. [Christopher] has tampered with [Marian's] mail-box;

k. [Christopher] has used a flashlight to blind [Rachel] while she was driving on the shared driveway; and

l. [Christopher] has posted personal identifying information relating to [Marian] on the Connecticut Judicial Branch website. . . .

"Cumulatively, the foregoing actions have been wrongfully and wilfully committed by [Christopher] without legal excuse or justification to cause injury to [Marian], to disrupt [Marian] in the peaceful enjoyment of her home and to disturb the sanctity of the Byrne household. . . . As a result of the foregoing wilful and malicious acts committed by [Christopher], [Christopher] has proximately caused and [Marian] has suffered physical injuries and emotional distress and has been injured by being denied the peaceful enjoyment of her home." The Byrnes sought to impose liability on the plaintiffs, alleging that Christopher's actions "constitute the commission of a prima facie tort."

At the outset, we note that § 870 of the Restatement (Second) of Torts recognizes a cause of action for prima facie tort. It provides: "One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." 4 Restatement (Second), Torts § 870, p. 279 (1979). The comments to § 870 explicitly establish that prima facie tort is not intended to be used to avoid the elements or defenses required of traditional torts: "the established intentional torts and their established legal privileges amount to [crystallizations] of the general principle stated in this Section. In determining whether liability should be imposed in a particular case for an established intentional tort, neither court nor jury engages afresh in balancing the conflicting interests of the parties. That has already been done in the creation of the legal rules of liability and privilege and all that is needed is to determine the facts and apply these rules to them." Id., comment (d), p. 281. Thus, not only must the injured party prove the elements of § 870, but they must also demonstrate that no other traditional torts would address their injury.

Under the circumstances of this appeal, and even assuming arguendo that Connecticut recognizes prima facie tort as a viable cause of action,[9] we conclude

---

[9] The Byrnes acknowledge in their brief that there is no decision from this court or our Supreme Court expressly recognizing prima facie tort as a viable cause of action. In *Connors* v. *Connolly*, 86 Conn. 641, 86 A. 600 (1913), the court stated: "The undisputed facts disclose that the plaintiff suffered damage in the loss of his employment, and that this damage was intentionally caused. These facts shown, a prima facie cause of action was made out against those who, thus acting with intent, caused the damage. Recovery, however, might be defeated by the establishment by these persons of a justification, the burden being upon them to do so." Id., 647. Although this language may be construed to describe the elements of prima facie tort, the court did not label the claim at issue as a prima facie tort, and no

that the trial court properly rejected the Byrnes' claim because the alleged conduct is adequately governed by existing torts. Specifically, as the trial court found, the allegations made in the Byrnes' seventh count largely are similar to the elements necessary to establish the traditional torts of intentional and/or negligent infliction of emotional distress. By labelling their cause of action as a "prima facie tort," the Byrnes are seeking recovery of damages that appear to be based on emotional distress without proving the elements of intentional and/or negligent infliction of emotional distress.[10] The Byrnes themselves acknowledge that "[a] cause of action for intentional infliction of emotional distress is unavailable to the Byrne defendants since the elements of the cause of the action require the claimant to prove that the emotional distress was severe. . . . The [Byrnes] concede that they have not suffered severe emotional distress. However, [Christopher's] conduct represents a continuing harassment of his neighbors, which conduct exceeds the bounds that are acceptable in a civilized society. The doctrine of prima facie tort is intended to address the misconduct that is alleged in this case. This is not to say that [Marian] did not experience stress and anxiety as a result of [Christopher's] tortious conduct."

appellate decision since *Connors* has had the opportunity to discuss whether prima facie tort is a viable cause of action in Connecticut.

[10] "In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). "[I]n order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 446, 815 A.2d 119 (2003).

We agree with the trial court that "[t]he recognition of such a claim based upon the facts alleged and proved in the case at bar would not be an expansion of Connecticut tort law, but rather a circumvention of existing law which requires certain elements in order for a party to recover for damages that include emotional distress." Thus, we cannot conclude that the court erred in rendering judgment in favor of the plaintiffs on the Byrnes' cause of action alleging prima facie tort.

B

The Byrnes also claim that the court improperly awarded only nominal damages to Jack and Rachel with respect to their vexatious litigation claim. We disagree.

Under General Statutes § 52-568, "[a]ny person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

"[T]he plaintiff in a vexatious [litigation] action, like any other plaintiff, has the burden of proving damages." (Internal quotation marks omitted.) *Greene* v. *Keating*, 197 Conn. App. 447, 453, 231 A.3d 1178 (2020). "In reviewing a trial court's award of compensatory damages, we have stated that [t]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the [plaintiff's] loss. . . . The [plaintiff has] the burden of proving the

nature and extent of the loss . . . . Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Citations omitted; internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 418–19, 948 A.2d 1009 (2008).

The following additional facts are relevant to the Byrnes' counterclaim. "In 2019, [Christopher], alone, brought an action against Marian, Rachel, Jack, [Janis] and two of [Janis'] tenants. [Christopher] was self-represented at the time he brought the action. The 2019 action by [Christopher] alleges many of the facts that are the basis of the subject action brought by [Christopher] and [Cynthia] against the same defendants." "Subsequent to the filing of the 2019 action, the [plaintiffs] retained counsel. Rather than amending the complaint and pleadings filed by the self-represented [Christopher], counsel on behalf of [Christopher], withdrew the 2019 action and began the subject action."

In their counterclaim, the Byrnes "assert[ed] two counts each sounding in vexatious litigation alleging that the 2019 action was vexatious and brought without probable cause. They claim[ed] double damages pursuant to [General Statutes §] 52-568 (1). Each also alleged that the 2019 action was without probable cause and was instituted with a malicious intent to unjustly vex and trouble them. They therefore claim[ed] treble damages pursuant to . . . [§] 52-568 (2)."

The court found that "the 2019 action was vexatious as to Rachel and Jack, but not as to Marian." As for damages, the court found "[t]here [was] evidence that in the defense of the 2019 action, legal fees in the amount of $5600 dollars were incurred. However, the evidence [was] also clear that the $5600 was paid by

Marian and not by Rachel and Jack. There is no evidence[11] that Rachel and Jack were otherwise damaged or harmed by the vexatious litigation against them in 2019 and, accordingly, the court awards each of them $1 for each count in nominal damages. Accordingly, judgment will enter in favor of Christopher on count[s] one and two of the counterclaim. Judgment will enter in favor of Rachel on count[s] three and four of the counterclaim and the court awards $1 for nominal damages in favor of Rachel on each count. Judgment will enter in favor of Jack on counts five and six of the counterclaim, and the court will also award nominal damages of $1 in favor of Jack." (Footnote added.)

The Byrnes now argue that the trial court committed two errors: "(1) [t]he trial court failed to appreciate that the amount of attorney's fees incurred in the defense of a vexatious action does not need to be paid by the party defending the action . . . and (2) [t]he trial court failed to consider the damages incurred by Jack and Rachel as a result of [Christopher's] disregard of Jack and Rachel's right to be free from unjustifiable litigation and the damage to their reputation." The Byrnes assert that "there is more to the defense of a litigation than the payment of attorney's fees."

We conclude that the evidence in the record supports the trial court's award of nominal damages. The court based its award on evidence that established that neither Rachel nor Jack incurred fees defending themselves in the 2019 action. As for other compensatory damages, Rachel and Jack had the burden of proving the nature and extent of their loss. However, they failed to provide evidence for the trial court to measure their

---

[11] The Byrnes' attorney's fees were invoiced only to Marian, not her adult children. Although Rachel and Jack claim that they will be reimbursing Marian for their attorney's fees, they have failed to provide any evidence, such as a retainer agreement with their attorney or a written agreement supporting their claim of future reimbursement to their mother.

loss. Accordingly, we cannot say that the trial court's award was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

## APPENDIX

